IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

LEROY PEAK,

                Plaintiff,

      v.

BRADLEY SCHWEBLER, *et al.,*

                Defendants.

Civil Action No.
9:11-CV-0041 (MAD/DEP)

_____

APPEARANCES:

FOR PLAINTIFF:

LEROY PEAK, *Pro Se*
92-B-1880
Clinton Correctional Facility
P.O. Box 2002
Dannemora, New York 12929

FOR DEFENDANTS:

HON. ERIC T. SCHNEIDERMAN
Office of the Attorney General
State of New York
Department of Law
The Capitol
Albany, New York 12224

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

OF COUNSEL:

DEAN J. HIGGINS, ESQ.
Assistant Attorney General

<u>REPORT AND RECOMMENDATION</u>

*Pro se* plaintiff Leroy Peak, a New York State prison inmate, commenced this action against the Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS") and five other DOCCS employees, pursuant to 42 U.S.C. § 1983, alleging deprivation of his civil rights. In his complaint and accompanying materials, plaintiff alleges that, after having been asked by prison officials to serve as an informant, he was (1) exposed to danger from fellow inmates; (2) subjected to harsh conditions of confinement, including being placed in protective custody without periodic reviews; and (3) not provided recreation, access to religious services, or rehabilitation services during the relevant times.

As a result of an intervening court decision, following an initial review of his complaint and accompanying motion for leave to proceed *in forma pauperis*, combined with his failure to avail himself of an opportunity to amend his complaint, plaintiff's claims have been significantly narrowed. The claims raised in this action now include only (1) a violation of his Eighth Amendment rights, based upon alleged deprivation of his right to exercise; (2) abridgment of his First Amendment right to freely

exercise his chosen religion; and (3) a violation of his right to due process under the Fourteenth Amendment, as a result of the alleged failure to periodically review his protective-custody status. In addition, the only defendants that remain in this action are defendants Schwebler, Talavera, Rasco, and Crystal.

Now that discovery in the action has been completed, defendants have filed a motion for summary judgment on all of plaintiff's remaining claims based on procedural and substantive grounds. For the reasons set forth below, I recommend defendants' motion, which plaintiff has only modestly opposed, be granted.

I.     BACKGROUND [1]

Plaintiff is serving a sentence of imprisonment of between sixteen years and life in DOCCS custody. Peak Aff. (Dkt. No. 1, Attach. 2) at ¶¶ 5-6. From May of 2009, until shortly after commencement of this action, plaintiff was housed in the Coxsackie Correctional Facility ("Coxsackie"), located in Coxsackie, New York. *Id.* at ¶ 11; Change of Address Notice Filed February 14, 2011 (Dkt. No. 5). In his complaint and accompanying

---

[1]     In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

documents, plaintiff alleges that while incarcerated at Coxsackie, he was exposed to danger by fellow inmates, denied the right to attend religious services, deprived of the right to exercise for eighteen months, and placed in protective custody without periodic reviews of this status. Peak Aff. (Dkt. No. 1, Attach. 2) at ¶¶ 8, 9; Peak MOL (Dkt. No. 1, Attach. 1) at ¶ 8, 9, 10. Plaintiff traces that treatment, including the exposure to danger, which allegedly led to his protective-custody status, to an instruction in 1997 by defendant Roger Rasco, a DOCCS Corrections Counselor, that plaintiff become an informant and advise prison officials of the presence of any weapons or planned prison riots at the facility while he was incarcerated at the Shawangunk Correctional Facility. Peak Aff. (Dkt. No. 1, Attach. 2) at ¶¶ 6-7.

II.     PROCEDURAL HISTORY

        Plaintiff commenced this action on January 12, 2011. Dkt. No. 1. Although plaintiff's complaint names only three defendants, including DOCCS Commissioner, Brian Fischer; DOCCS Director of Classification, Theresa Knapp-David; and Bradley Schwebler, a Corrections Counselor at Coxsackie, the attachments to the complaint also suggest that

Corrections Counselors Roger Rasco, Kim Talavera[2] and Neil Crystal have also been named by him as defendants. *See generally* Plaintiff's Complaint (Dkt. No. 1, Attach. 1).

After reviewing plaintiff's complaint and accompanying *in forma pauperis* application, pursuant to 28 U.S.C. § 1915(e), District Judge Mae A. D'Agostino issued a decision on May 19, 2011, dismissing some of plaintiff's claims and upholding others, and affording plaintiff an opportunity to submit an amended complaint to correct the deficiencies identified in that decision. Dkt. No. 7. As a result of that decision, which thoroughly addressed the claims gleaned by the court from plaintiff's complaint and supporting attachments, Judge D'Agostino ordered dismissal of plaintiff's claims with the exception of (1) an Eighth Amendment claim, based upon an allegation that defendants deprived plaintiff of exercise; (2) a First Amendment free exercise of religion claim; and (3) a procedural due process claim under the Fourteenth Amendment, resulting from defendants' alleged failure to conduct periodic reviews of plaintiff's protective-custody status. Decision and Order Dated May 19,

_____

[2]     Defendant Kim Talavera was mistakenly identified by plaintiff in his complaint as "Tolevera." The clerk is respectfully directed to amend the court's records to reflect the correct spelling of Ms. Talavera's name.

2011 (Dkt. No. 7) at 30.  In that decision, Judge D'Agostino also

dismissed defendants Fischer and Knapp-David from the action, based

upon the fact that plaintiff's complaint failed to plead facts plausibly

suggesting that those defendants were personally involved in the

allegations that give rise to plaintiff's claims.  *Id.* at 25-26, 30-31.  Despite

the leave granted in that order to file an amended complaint, plaintiff has

not taken advantage of that opportunity.  *See generally* Docket Sheet.

On April 30, 2012, following the close of discovery, defendants

moved for the entry of summary judgment dismissing plaintiff's remaining

claims.  Dkt. No. 27.   In their motion, defendants argue that (1) plaintiff's

complaint fails to state a claim as it relates to any of the three surviving

causes of action; (2) plaintiff is precluded from pursuing this action based

on his failure to exhaust available administrative remedies before

commencing suit; (3) none of defendants were personally involved in any

of the alleged conduct giving rise to the claims set forth in plaintiff's

complaint; and (4) the claims asserted against defendant Rasco are time-

barred.  *Id.* at 8-16.  In response, plaintiff has offered a three-page

submission, in which he appears to focus principally upon the previously

dismissed failure-to-protect claim, arguing that, as a result of defendants'

negligence, he was allegedly assaulted by another inmate.  Dkt. No. 33 at 2-3.

Defendants' motion, which is now fully briefed and ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See* Fed. R. Civ. P. 72(b).

III.     DISCUSSION

A.     Summary Judgment Standard

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure.  Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426

F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Sec. Ins.*, 391 F.3d at 83.  In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party.  *See Bldg. Trades*

*Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

### B. Exhaustion of Remedies

In his form complaint, Peak has acknowledged the existence of a grievance procedure at Coxsackie, and alleges that he did present facts relating to his complaint through that grievance program, and further that he "filed an exhausted appeal." Complaint (Dkt. No. 1) ¶ 4. In their motion for summary judgment, defendants refute that claim, and have submitted a declaration from Karen Bellamy, the Director of the DOCCS's Inmate Grievance Program ("IGP"), stating that, based upon her search of a database containing records of all grievances appealed to the DOCCS's Central Office Review Committee ("CORC"), Peak has not appealed any grievance denials to that body. Bellamy Decl. (Dkt. No. 27, Attach. 14) ¶¶ 1-3. Based on this declaration, defendants contend that plaintiff is precluded from pursuing his unexhausted claims in this action.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the

ability of prisoners to maintain federal civil rights actions, provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006); *Hargrove v. Riley,* No. CV-04-4587, 2007 WL 389003, at \*5-6 (E.D.N.Y. Jan. 31, 2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, the plaintiff's complaint is subject to dismissal. *See Pettus v. McCoy*, No. 04-CV-0471, 2006 WL 2639369, at \*1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.) ("Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed[.]"); *see also Woodford*, 548 U.S. at 94-95 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper

10

exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *see also Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007) (citing *Woodford*).[3]

New York prison inmates are subject to an IGP established by the DOCCS, and that procedure is recognized as an "available" remedy for purposes of the PLRA. *Mingues v. Nelson*, No. 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004) (citing *Mojias v. Johnson*, 351 F.3d 606 (2d Cir. 2003) and *Snider v. Melindez*, 199 F.3d 108, 112-13 (2d Cir.1999)). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident.[4] 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the

---

[3] While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "'in a substantive sense,'" an inmate plaintiff nonetheless must also procedurally exhaust his available administrative remedies within the appropriate grievance construct to satisfy the PLRA. *Macias*, 495 F.3d at 43 (quoting *Johnson v. Testman*, 380 F.3d 691, 697-98 (2d Cir. 2004) (emphasis omitted)).

[4] The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances." 7 N.Y.C.R.R. § 701.6(g)(1)(i)(a)-(b).

IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the CORC, which makes the final administrative decision. *Id.* § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, "only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to [section] 1983 in federal court." *Reyes v. Punzal*, 206 F. Supp. 2d 431, 432 (W.D.N.Y. 2002) (citing, *inter alia*, *Sulton v. Greiner*, No. 00-Civ-0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec. 11, 2000)).

As previously noted, in his complaint, which was signed under penalty of perjury and thus constitutes the equivalent of an affidavit, *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995), plaintiff avers that he filed a grievance regarding the facts giving rise to this action, and pursued that grievance to completion. Dkt. No. 1 at ¶ 4. In their motion, supported by a sworn declaration given by IGP Director Karen Bellamy, defendants contend otherwise. Dkt. No. 27, Attach. 14 at ¶¶ 1-3. These squarely conflicting accounts give rise to a dispute of fact that cannot appropriately be decided on motion for summary judgment since deciding the matter would require the court to make a credibility determination without the aid

of live testimony.  *See* Fed. R. Civ. P. 56 advisory committee's note to 1963 Amendment ("Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate credibility, summary judgment is not appropriate.").  I therefore recommend that defendants' motion for summary judgment based on a failure-to-exhaust defense be denied.

      C.     <u>Statute of Limitations</u>

Among the allegations set forth in plaintiff's complaint is that, through his conduct in 1997, defendant Rasco set in motion the events allegedly giving rise to Peak's constitutional claims.  Complaint (Dkt. No. 1, Attach. 2) at ¶¶ 6-7.  Defendants argue that any cause of action asserted against defendant Rasco under 42 U.S.C. § 1983 is untimely. Dkt. No. 27, Attach. 15 at 15-16.

Consistent with the Supreme Court's pronouncement that, in actions brought under section 1983, the applicable limitations period is derived from the general or residual statute of limitations for personal injury actions under the laws of the forum state, *Owens v. Okure,* 488 U.S. 235, 249-50 (1989), plaintiff's federal claim in this action is governed by the three-year statute of limitations that applies to personal injury claims of an

otherwise unspecified nature in New York.  N.Y. C.P.L.R. § 214(5); *see also Ormiston v. Nelson*, 117 F.3d 69, 71 (2d Cir. 1997) (quoting *Owens*); *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1156 (2d Cir. 1995); *Lugo v. Senkowski*, 114 F. Supp. 2d 111, 113 (N.D.N.Y. 2000) (Kahn, J.) (citing *Pinaud* and *Owens*).  For purposes of determining whether plaintiff commenced this action within the relevant limitations period, I deem plaintiff's complaint to have been filed on January 2, 2011.[5]  Plaintiff's claims are thus untimely unless found to have accrued on or after January 2, 2008.

The sole reference to defendant Roger Rasco in plaintiff's complaint concerns a conversation that is alleged to have taken place in 1997.  Dkt. No. 1, Attach. 1 at ¶¶ 6-7.  Moreover, defendants assert that defendant Rasco and plaintiff have had no communication for at least ten years prior to the commencement of this action.  Defendants' Local Rule 7.1(a)(3)

_____

[5]     While plaintiff's complaint was not formally filed with the court until January 12, 2011, it is dated January 2, 2011.  Dkt. No. 1.  Affording plaintiff the benefit of the doubt, I have construed the action as having been commenced on the earlier date because the "prison mailbox rule" recognized in this circuit deems the filing of a *pro se* prisoner civil rights action to be the date that the prisoner-plaintiff is presumed to have handed his complaint to a prison guard for mailing, which is the last date appearing on the face of the plaintiff's complaint.  *Houston v. Lack,* 487 U.S. 266, 270-76 (1988) (applying rule in *habeas corpus* actions); *Garraway v. Broome County, N.Y.,* No. 03-CV-0681, 2006 WL 931729, at *3 (N.D.N.Y. Apr. 7, 2006) (McAvoy, J.) (applying rule in section 1983 actions).

Statement (Dkt. No. 27, Attach. 1) at ¶ 3.  By virtue of his failure to respond specifically to Defendants' Local Rule 7.1(a)(3) statement as required by the Local Rules of Practice for this court, plaintiff is deemed to have admitted this fact.  *See*, *e.g.*, *Elgamil v. Syracuse Univ.*, No. 99-CV-0611, 2000 WL 1264122, at *1 (Aug. 22, 2000) (McCurn, J.) ("[C]ourts in this district have not hesitated to enforce Rule 7.1(a)(3) . . . by deeming facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule."); *see also Monahan v. New York City Dep't of Corrs.*, 214 F.3d 275, 292 (2d Cir. 2000) ("A district court has the discretion to adopt local rules[, like Local Rule 7.1,] that are necessary to carry out the conduct of its business.").  As a result, I find that there is no record evidence to suggest that there is a genuine dispute of material fact as to whether defendant Rasco's alleged conduct giving rise to plaintiff's claims occurred any time after January 2, 2008.  For this reason, I recommend dismissal of plaintiff's claims against that defendant based on the expiration of the governing statute of limitations.[6]

---

[6]    In certain instances, an otherwise untimely claim may be pursued through application of equitable tolling.  Equitable tolling is a doctrine applied in "'rare and exceptional circumstances,' where [the court finds] that 'extraordinary

(continued...)

D.    Personal Involvement

In their motion, defendants argue that, because there is no record evidence to show that have been personally involved in the alleged acts giving rise to plaintiff's remaining claims, plaintiff's complaint should be dismissed.  Dkt. No. 27, Attach. 15 at 14-15.

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983.'"  *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977)).  As the Supreme Court has noted, a defendant may only be held accountable for his actions under section 1983.  *See Ascroft v. Iqbal*, 556 U.S. 662, 683 (2009) ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected

---

[6](...continued)
circumstances' prevented a party from timely performing a required act and that party 'acted with reasonable diligence throughout the period he [sought] to toll.'" *Czernicki v. U.S. Dep't of Justice*, 137 F. App'x 409, 410, 2005 WL 1498456, at *1 (2d Cir. 2005) (quoting *Doe v. Menefee*, 391 F.3d 147, 159-60 (2d Cir. 2004)). The doctrine may be applied where a statute of limitations has passed due to "defective pleading" or the defendant's "misconduct" in preventing the plaintiff from bringing his claim or learning of the cause of action.  *Czernicki*, 137 F. App'x at 411 (citing *Irwin v. Dep't of Veterans Affairs*, 489 U.S. 89, 96 (1990) and *Kronisch v. United States*, 150 F.3d 112, 123 (2d Cir. 2005)).  In this case, plaintiff has presented no circumstances that would warrant invoking equitable tolling.

characteristic.").  In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and the actions of that particular defendant.  *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

The record now before the court fails to show that defendants Schwebler, Talavera and Crystal, all Corrections Counselors at Coxsackie, had any personal involvement in determining whether plaintiff should be permitted to attend religious services or participate in exercise or recreation.  Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 27, Attach. 1) at ¶¶ 5-11, 17.  Moreover, the declarations submitted by defendants in support of their motion for summary judgment confirms their lack of involvement.  Talavera Decl. (Dkt. No. 27, Attach. 11) at ¶¶ 4-6; Schwebler Decl. (Dkt. No. 27, Attach. 12) at ¶¶ 4-6; Crystal Decl. (Dkt. No. 27, Attach. 13) at ¶¶ 4-6.  Indeed, consistent with those statements, during his deposition plaintiff appears to have acknowledged that those defendants did not have any role in denying him the right to attend religious services or to exercise.  Peak Dep. Tr. (Dkt. No. 27, Attach. 3) at 23, 25-26 33-34.

It does appear, however, that defendants Talavera, Schwebler, and

Crystal may have been personally involved in the completion of normal reviews for inmates, including those being held in protective custody. Talavera Decl. (Dkt. No. 27, Attach. 11) at ¶ 8; Schwebler Decl. (Dkt. No. 27, Attach. 12) at ¶ 8; Crystal Decl. (Dkt. No. 27, Attach. 13) at ¶ 8; Higgins Decl. (Dkt. No. 27, Attach. 5).  Nonetheless, during his deposition, Peak testified that his due process claim does not arise from those defendants' failure to conduct periodic reviews of his protective custody status.  *See* Peak Dep. Tr. (Dkt. No. 27, Attach. 3) at 34 ("I ain't said they failed to review my protective custody status."); *see also* Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 27, Attach. 1) at ¶ 13.

In light of their lack of involvement in the conduct giving rise to plaintiff's Eighth Amendment claim for cruel and unusual punishment, based upon the alleged denial of his rights to participate in exercise or recreation, his First Amendment religious free exercise claim, and his procedural due process cause of action, I recommend dismissal of those claims as against defendants Schwebler, Talavera and Crystal.

E.    Merits of Plaintiff's Eighth Amendment Claim

Plaintiff's Eighth Amendment claim is based on his allegations that he was denied the opportunities to exercise and participate in recreation. Complaint (Dkt. No. 1, Attach. 1) at 4.  The Eighth Amendment prohibits cruel and unusual punishment, including the "unnecessary and wanton infliction of pain," which is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society.'" *Estelle v. Gamble,* 429 U.S. 97, 102 (1976 (quoting *Trop v. Dulles*, 356 U.S. 86 at 101 (1958)); *see also Whitley v. Albers,* 475 U.S. 312, 319 (1986) (citing, *inter alia, Estelle*).  "[T]he conditions under which [a prisoner] is confined are subject to scrutiny under the Eighth Amendment."  *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  Although the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement.  *Farmer,* 511 U.S. at 832.

A claim arising from allegations that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement.  *Leach v. Dufrain,* 103 F. Supp. 2d 542, 546 (N.D.N.Y. 2000) (Kahn, J.) (citing *Davidson v. Coughlin*, 920 F. Supp. 305, 308 (N.D.N.Y. 1996) (McAvoy, J.)).  "[T]he conditions complained of must be 'sufficiently

19

serious' from an objective standpoint, and the plaintiff must demonstrate that prison officials acted subjectively with 'deliberate indifference.'" *Leach*, 103 F. Supp. 2d at 546 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298, 297 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J., adopting report and recommendation by Homer, M.J.). Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837; *Leach*, 103 F. Supp. 2d at 546 (citing *Farmer*); *Waldo*, 1998 WL 713809, at *2 (same).

It is well established that the Eighth Amendment extends a right to exercise to prison inmates. *See Williams v. Goord*, 142 F. Supp. 2d 416, 425 (S.D.N.Y. 2001) ("[T]his Court has already found, based on clearly established law in this Circuit, that 'exercise is one of the basic human needs protected by the Eighth Amendment.'" (quoting *Williams v. Greifinger*, 97 F.3d 699, 704 (2d Cir. 1996))). That right, however, is not limitless, nor does it guaranty an inmate's ability to participate in all forms of recreation. *Cf. Davidson v. Coughlin*, 968 F. Supp. 121, 129 (S.D.N.Y.

1997) (listing cases). Moreover, occasional, isolated interruptions or denials of the right to exercise are considered constitutionally *de minimis*. *See Davidson*, 968 F. Supp. at 129 (finding that "temporary denials of exercise may be constitutional") (citing cases); *Gibson v. City of New York*, No. 96-CV-3409, 1998 WL 146688, *3 (S.D.N.Y. Mar. 25, 1998) ("[T]he deprivation of the opportunity to participate in recreation for eight days in a sixty day period, even when coupled with the deprivation of an opportunity to exercise on two consecutive days, is not sufficiently serious to constitute punishment under the Fourteenth Amendment."); *Young v. Scully,* Nos. 91-CV-4332, 91-CV-4801, 91-CV-6769, 1993 WL 88144, at *5 (S.D.N.Y. March 22, 1993) (holding that the plaintiff's Eighth Amendment rights were not violated when he was deprived of exercise "for a period of several days").

In this case, District Judge D'Agostino construed plaintiff's complaint as asserting an Eighth Amendment claim based on the allegation that he was denied recreation and exercise for a period of eighteen months. Decision and Order Dated May 19, 2011 (Dkt. No. 11) at 11. When pressed for specifics at his deposition regarding this claim, however, Peak clarified that he was not claiming that he was wholly deprived of any form

of exercise, and in fact, emphasized that he was provided regular exercise while at Coxsackie.  *See* Peak Dep. Tr. (Dkt. No. 27, Attach. 3) at 34 ("I don't have any complaints about no one concerning me being afforded the opportunity to exercise.").  Based on this testimony, I find there is no merit to plaintiff's Eighth Amendment exercise claim, and recommend its dismissal on this ground.

### E.      Merits of Plaintiff's Due Process Claim

In his complaint, plaintiff has alleged that, while at Coxsackie, he was placed in involuntary protective custody status and denied the periodic reviews of that status, as mandated both by prison regulations and under the due process clause of the Fourteenth Amendment. Complaint (Dkt. No. 1, Attach. 1) at 3.  Defendants seek dismissal of this claim arguing that, based on the record before the court, even when construed in plaintiff's favor, there are no facts that support the allegation that he has been involuntarily deprived of a liberty interest as a result of their actions.  Dkt. No. 27, Attach. 15 at 11-13.

To successfully state a procedural due process claim under section 1983, a plaintiff must show that he (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient due

process.  *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).  Involuntarily placing an inmate into administrative segregation may implicate a liberty interest protected under the Fourteenth Amendment if it results in an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor*, 515 U.S. 472, 484 (1995); *see also Davis v. Barrett*, 576 F.3d 129, 134-35 (2d Cir. 2009) (holding that forty-one days in administrative confinement could constitute a deprivation of a cognizable liberty interest, depending upon the conditions to which the plaintiff inmate was subjected).

In this instance, the record does not support plaintiff's allegation that he was involuntarily deprived of a liberty interest without due process. During his deposition, Peak testified that he was *voluntarily* placed in protective custody.  Peak Dep. Tr. (Dkt. No. 27, Attach. 3) at 28.  This is substantiated by declarations given by defendants Talavera, Schwebler, and Crystal.  Talavera Decl. (Dkt. No. 27, Attach. 11) at ¶ 7; Schwebler Decl. (Dkt. No. 27, Attach. 12) at ¶ 7; Crystal Decl. (Dkt. No. 27, Attach. 13) at ¶ 7.  As a result, because I find that plaintiff has failed to establish

that he was involuntarily deprived of a liberty interest sufficient to trigger the Fourteenth Amendment's due process requirements, I recommend this claim be dismissed on the merits.

IV.   SUMMARY AND RECOMMENDATION

While defendants are not entitled to summary judgment based on their failure-to-exhaust argument, due to the existence of a genuine dispute of fact as to whether exhaustion in-fact occurred, I nonetheless recommend dismissal of the remaining claims in this action based on the merits, the lack of personal involvement of defendants Talavera, Schwebler, and Crystal, and further, as it relates to defendant Rasco, based on the governing three-year statute of limitations.  It is therefore hereby respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 27) be GRANTED, and that plaintiff's remaining claims in this action be DISMISSED in all respects.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.
 FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court revise court records regarding this case to reflect the correct spelling of defendant Kim Talavera's name; and it further respectfully

ORDERED, that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

_____
David E. Peebles
U.S. Magistrate Judge

Dated:      January 3, 2013
            Syracuse, New York



Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

C Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

**\*1** Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that
Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff [FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and filed
the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski,* 430 F.3d 560, 562 (2d
Cir.2005)(deeming *pro* se prisoner's § 1983
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
the operative date is between August 27, 2004
and September 20, 2004. As discussed, *infra,*
both of these dates occur before Hargrove
properly exhausted the administrative remedies
available to him at NCCF.

FN2. The Nassau County University Medical
Staff are employed by the Nassau Health Care
Corporation ("NHCC"). Pursuant to the
Correctional Center Health Services Agreement
between the County of Nassau and NHCC, dated
September 24, 1999, NHCC provides medical
services for inmates at NCCF. County Defs.'s

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.[FN4] Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a (1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.[FN5] Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his [Section 1983](#) claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp., Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, [high blood pressure](#), chronic back pain, [lung infection](#), dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp. at 3-4.

**(3)**

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. [FN6](#) The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

[FN6.](#) Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

FN8. Hargrove has not argued that he was unaware of this five-day deadline.

FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

(4)

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A.-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

> FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

*4 A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated

documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

*5 Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest argument, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,*

--- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).*See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth,* 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford,* 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock,* 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero,* 467 F.3d at 176 (quoting *Woodford,* 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2382).

**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see* *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see* *Williams,* 418 F.Supp.2d at 101. *See also* *Sloane v. W. Mazzuca,* No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Thus, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

**\*7** Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero,* 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford,* 126 S.Ct. at 2382).

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

> FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams, 418 F.Supp.2d at 101, 102* (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e .g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams, 418 F.Supp.2d at 101* (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by 42 U.S.C. § 1997e(a) unless Hargrove can establish excuse for his failure to exhaust.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(4)**

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

**\*8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at * 8-11;*Sloane,* 2006 WL 3096031, at *4;*Williams,* 418 F.Supp.2d at 101. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175;*Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by Section 1997e(a) of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

> FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law"). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

**a. Whether administrative remedies were "available" to Hargrove**

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14] *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs'. Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

### c. Special circumstances

**\*10** Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Hemphill,* 380 F.3d at 688 (quoting *Giano,* 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." *Giano,* 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. *See Sloane,* 2006 WL 3096031, at *8; *Freeman v. Goord,* No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

### (5)

### Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." *Woodford,* 126 S.Ct. at 2385. *See also Ruggiero,* 467 F.3d at 178 (citing *Porter,* 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." *Berry,* 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests were given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. *Berry,* 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

**\*11** Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. *Shangold v. The Walt Disney Co.,* No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." *Gleason v. Jandrucko,* 860 F.2d 556, 559 (2d Cir.1988); *McMunn v. Mem'l Sloan-Kettering Cancer Center,* 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the presentation of the opposing party's claim or defense." *McMunn,* 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold,* 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn,* 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer,* 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn,* 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold,* 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic,* 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn,* 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

### Conclusion

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))



**C**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
James PETTUS, Plaintiff,
v.
Jospeh McCOY, Superintendent, Deputy Ryan,
Defendants.
**No. 9:04-CV-0471.**

Sept. 13, 2006.

James Pettus, Comstock, NY, pro se.

Charles J. Quackenbush, New York State Attorney
General, The Capitol Albany, NY, for Defendants.

### DECISION and ORDER

THOMAS J. McAVOY, Senior District Judge.

**\*1** Plaintiff commenced the instant action asserting
various violations of his constitutional rights arising out of
his placement at the Southport Correctional Facility. In his
Complaint, Plaintiff alleges that he was improperly sent to
the Special Housing Unit ("SHU") at a maximum security
facility and that being in SHU has put his life in jeopardy.
Currently before the Court is Defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56 seeking
dismissal of the Complaint in its entirety for failure to
exhaust administrative remedies.

**I. FACTS**[FN1]

> **FN1.** The following facts are taken from
> Defendants' statement of material facts submitted

pursuant to N.D.N.Y.L.R. 7.1(a)(3). These facts
are deemed admitted because they are supported
by the record evidence and Plaintiff failed to
submit an opposing statement of material facts as
required by Rule 7.1(a)(3). Plaintiff was
specifically advised by Defendants of his
obligation to file an opposing statement of
material facts and to otherwise properly respond
to the motion for summary judgment.

Plaintiff is an inmate in the custody of the New York State
Department of Correctional Services. Plaintiff signed the
instant Complaint on April 7, 2004. On his Complaint
form, Plaintiff indicated that there is a grievance
procedure available to him and that he availed himself of
the grievance procedure by filing a complaint with the
IGRC [FN2], followed by an appeal to the superintendent of
the facility, and then to the Central Office Review
Committee in Albany. The Complaint indicates that
Plaintiff is "waiting for response from Albany." The
Complaint was filed on April 27, 2004.

> **FN2.** Inmate Grievance Review Committee.

On April 12, 2004, prior to the filing of the instant
Complaint, Plaintiff filed a grievance relating to the issues
presented in this case. On April 19, 2004, the IGRC
recommended that Plaintiff's grievance be denied. Plaintiff
then appealed that decision to the facility Superintendent.
In the meantime, on April 27, Plaintiff commenced the
instant litigation. On May 3, 2004, after Plaintiff filed the
Complaint in this case, the Superintendent denied
Plaintiff's grievance. On May 5, 2004, Plaintiff appealed
the decision to the Central Office Review Committee in
Albany. On June 23, 2004, the Central Office Review
Committee denied Plaintiff's appeal. Plaintiff did not file
any other grievances in connection with the matters raised
in this lawsuit.

Defendants now move to dismiss on the ground that
Plaintiff commenced the instant action before fully
exhausting his available administrative remedies.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)
(Cite as: 2006 WL 2639369 (N.D.N.Y.))

## II. DISCUSSION

The sole issue presented is whether Plaintiff was required to complete the administrative process before commencing this litigation. This issue has already been addressed by the Second Circuit in *Neal v. Goord,* 267 F.3d 116 (2d Cir.2001). The issue in that case was "whether plaintiff's complaint should have been dismissed despite his having exhausted at least some claims during the pendency of his lawsuit." *Id.* at 121. The Second Circuit held that "exhausting administrative remedies after a complaint is filed will not save a case from dismissal." *Id.*

In this case, Defendants have established from a legally sufficient source that an administrative remedy is available and applicable. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003); *see also* 7. N.Y.C.R.R. § 701.1, *et seq.* Plaintiff's Complaint concerns his placement in SHU at a maximum security facility. These are matters that fall within the grievance procedure available to NYSDOCS inmates and are required to be exhausted under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. Plaintiff has failed to demonstrate any applicable exception to the exhaustion requirement. Because Plaintiff commenced the instant litigation prior to fully completing the administrative review process, the instant Complaint must be dismissed without prejudice. *Neal,* 267 F.3d 116.

## III. CONCLUSION

**\*2** For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and the Complaint is DISMISSED WITHOUT PREJUDICE. The Clerk of the Court shall close the file in this matter.

IT IS SO ORDERED.

N.D.N.Y.,2006.
Pettus v. McCoy
Not Reported in F.Supp.2d, 2006 WL 2639369 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
William MINGUES, Plaintiff,
v.
C.O NELSON and C.O. Berlingame, Defendants.
**No. 96 CV 5396(GBD).**

Feb. 20, 2004.

**Background:** Inmate brought a § 1983 action asserting, inter alia, claims of excessive force during his wife's visit with him at the correctional facility.

**Holding:** On a defense motion to dismiss, the District Court, Daniels, J., held that the record established that the action was filed after the effective date of the Prison Litigation Reform Act (PLRA).
Motion granted.

West Headnotes

Civil Rights 78 ⚷ 1395(7)

78 Civil Rights
    78III Federal Remedies in General
        78k1392 Pleading
            78k1395 Particular Causes of Action
                78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases
Record established that inmate's § 1983 action was filed after the effective date of the Prison Litigation Reform Act of 1996 (PLRA), such that the inmate's failure to exhaust his administrative remedies precluded relief; examination of the initial complaint itself, on its face, unequivocally demonstrated that the inmate's subsequent allegation in his amended complaint that he filed the complaint in April of

1996 was patently false; there was no explanation offered that could reasonably support and account for the existence of May dates on the complaint. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a).

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** This § 1983 action was originally commenced by the plaintiff,[FN1] a prisoner in New York State custody, and his wife claiming their civil rights were violated during the wife's visit with plaintiff at the correctional facility. Discovery in this matter has concluded. Previously, all claims asserted by plaintiff's wife were dismissed for failure to prosecute. Additionally, defendants' summary judgment motion was denied with respect to plaintiff's claims of excessive force,[FN2] and summary judgment was granted dismissing all of plaintiff's other claims. Defendants now seek to dismiss the remaining excessive force claims on the grounds they are barred by the Prisoner Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a), as plaintiff failed to exhaust his administrative remedies.

FN1. Plaintiff and his wife were proceeding *pro se* when they filed the complaint and amended complaint. Thereafter, plaintiff obtained legal representation.

FN2. In the amended complaint, plaintiff alleges he was beaten, kicked and punched. (Am.Compl. § 6). In his original complaint, he had also claimed that he was whipped." (Compl. at 7, 8). Plaintiff testified at his deposition that he was slapped once in the face, punched about four or five times in the lower back, and a correctional officer then laid on top of him. (Mingues Dep. at 78-81). The incident, which took approximately thirty to forty seconds, caused plaintiff to suffer from back pain for an unspecified period of time. (*Id.* at 81, 86).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

Subdivision (a) of § 1997e provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This provision became effective on April 26, 1996. *Blisset v. Casey,* 147 F.3d 218, 219 (2d Cir.1998). The PLRA's exhaustion requirement does not apply retroactively to actions pending when the Act was signed into law. *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003).

There is no dispute that plaintiff did not avail himself of the existing and available prison grievance procedure. Plaintiff, however, argues he was not required to exhaust his administrative remedies because, as alleged in his amended complaint, "petitioners (sic) had already filed in April 10-12 of 1996," prior to the PLRA's April 26, 1996 enactment date.[FN3] (Am.Compl. § 2). In order to determine the date that the instant action was commenced, the date of the filing of the amended complaint relates back to the filing date of the original complaint. Fed.R.Civ.P. 15(c). The original complaint was signed and dated by plaintiff's wife on May 8, 1996; it was stamped received by the Pro Se Office on May 10, 1996; and plaintiff's signature is dated May 13, 1996.[FN4]

> FN3. The amended complaint reads as follows:
>
> That the original complaint filed under and pursuant to Title 42 section 1983 and 1985 was made and submitted before this court in April of 1996, before the application of the Prisoner Litigation Reform Act of 1996 was signed into law. The Act was signed into law April 26, 1996 and petitioners had already filed in April 10-12 of 1996. (Am.Compl. § 2).
>
> FN4. Plaintiff's wife application for *in forma pauperis* relief was signed and dated May 8, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Plaintiff's signature, on his initial application for appointment of counsel, is dated May 13, 1996, and it is stamped as

received by the Pro Se Office on May 10, 1996. Attached to plaintiff's application, is his signed Affirmation of Service, also dated May 13, 1996, wherein plaintiff declared under penalty of perjury that he served his application upon the Pro Se Office. Plaintiff alleges that "between April 17, 1996 until October 7, 1996," all visitation was suspended between him and his wife and that their "only form of communications was correspondence ." (Am.Compl. § 7).

The matter was referred to Magistrate Judge Pitman for a Report and Recommendation ("Report"). Although the magistrate judge found that the three earliest possible dates that the evidence demonstrates the complaint could have been filed, *i.e.,* May 8th, 10th, and 13th of 1996, were all beyond the PLRA enactment date, he nevertheless recommended that the motion to dismiss be denied based on plaintiff's allegation in the amended complaint that he filed the original complaint April 10-12 of 1996, prior to the April 26, 1996 enactment date. The magistrate judge found that, "[i]n light of the express allegation in the Amended Complaint that plaintiff commenced the action before April 26, 1996 and the absence of a clear record to the contrary, the requirement that disputed factual issues be resolved in plaintiff's favor for purposes of this motion requires that the motion be denied." (Report at 12-13).

**\*2** Defendants object to the Report's conclusion that there is a material issue of fact regarding the date the action was filed. Plaintiff's attorney did not file any objections.[FN5] The Court must make a *de novo* determination as to those portions of the Report to which there are objections. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). It is not required that the Court conduct a *de novo* hearing on the matter. *United States v. Raddatz,* 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Rather, it is sufficient that the Court "arrive at its own, independent conclusion" regarding those portions to which the objections were made. *Nelson v. Smith,* 618 F.Supp. 1186, 1189-90 (S.D.N.Y.1985) (quoting *Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir.1983)). Accordingly, the Court, in the exercise of sound judicial discretion, must determine the extent, if any, it should rely upon the magistrate judge's proposed findings and recommendations. *Raddatz,* 447 U.S. at 676. The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. Fed.R.Civ.P. 72(b); 28 U.S.C. §

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

636(b)(1)(C). Where there are no objections, the Court may accept the Report provided there is no clear error on the face of the record. *Nelson v. Smith,* 618 F.Supp. at 1189; *see also Heisler v. Kralik,* 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd sub nom. Heisler v. Rockland County,* 164 F.3d 618 (2d Cir.1998).

> FN5. Plaintiff himself filed objections which was not adopted by his counsel. Plaintiff objects to the magistrate judge's finding that an issue exists as to when plaintiff filed the complaint because plaintiff asserts he gave it to prison officials to be mailed in April. Additionally, plaintiff objects to the magistrate judge's suggestion that the defendants convert their motion to one for summary judgment asserting the same theory as set forth in the present motion. Since this Court finds that the instant motion is meritorious, the propriety of plaintiff personally submitting his own objections need not be address as those objections are moot.

Upon a *de novo* review, the Report's recommendation that the motion be denied is rejected by the Court. Section 1997e (a) requires that inmates exhaust all available administrative remedies prior to the commencement of a § 1983 action concerning prison conditions, and failure to do so warrants dismissal of the action. *Porter v. Nussel,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Scott,* 344 F.3d at 290. The exhaustion of one's administrative remedies, however, is not a jurisdictional requirement under the PLRA. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003). A defendant may assert a non-exhaustion claim as an affirmative defense. *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Since it is an affirmative defense, defendants bear the burden of proof in this regard. *See, McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *Arnold v. Goetz,* 245 F.Supp.2d 527, 534-35 (S.D.N.Y.2003); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), is an appropriate vehicle to be used by a defendant where the failure to exhaust is clear from the face of the complaint as well as any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See, Scott v. Gardner,* 287 F.Supp.2d 477, 485 (S.D.N.Y.2003) (citation omitted); *McCoy,* 255 F.Supp.2d at 249.

In the amended complaint, plaintiff alleges, in a conclusory manner, that he filed the original complaint before the effective date of the PLRA, sometime between April 10th and April 12th of 1996.[FN6] On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inference in plaintiff's favor. *Resnick v. Swartz,* 303 F.3d 147, 150-51 (2d Cir.2002) (citation omitted); *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal is only warranted where it appears without doubt that plaintiff can prove no set of facts supporting his claims that would entitle him to relief. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The court's consideration is not limiting solely to the factual allegations set forth in the amended complaint. Rather, the court may also consider documents attached to the complaint as exhibits or incorporated in it by reference, matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which he has knowledge of and relied on in bringing the action. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citation omitted). The court is not bound to accept as true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances supporting such an assertion. *DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Nor must the court "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 (7th Cir.1992) (citation omitted).

> FN6. In response to then Chief Judge Thomas P. Griesa's 1996 order dismissing this action, plaintiff filed an Application for Reconsideration, dated October 28, 1996, wherein he claims that "on April 12, 1996 this petitioner filed a 1983 civil suit ..." (Pl.'s Mot. for Recons. at 1).

*3 Plaintiff fails to allege any factual basis in support of his claim that he filed the initial complaint between April 10-12, 1996. The Court is not required to accept this statement as a well-pleaded factual allegation in light of the existing record which clearly demonstrates that such an allegation is not only factually unsupported by the clear evidence, but is factually impossible. Generally, an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

amended complaint supersedes the original complaint, and renders it of no legal effect. *In re. Crysen/Montenay Energy Co.,* 226 F.3d 160, 162 (2d Cir.2000). In plaintiff's amended complaint, he states that he is submitting the amended complaint in support of his original complaint. Hence, the original complaint is incorporated by reference in the amended complaint, and may be considered by the Court. Even if the initial complaint was not so incorporated, given the circumstances of this case, the Court would nevertheless consider it as it relates to the original date of filing. An examination of the initial complaint itself, on its face, unequivocally demonstrates that plaintiff's subsequent allegation in his amended complaint that he filed the complaint between April 10th and 12th of 1996 is patently false.

The original complaint refers to plaintiff's prison disciplinary hearing arising out of the same incident forming the basis of the present lawsuit. Generally, the disciplinary charges against plaintiff were in connection with an alleged conspiracy by him and his wife to commit grand larceny against inmate Robert Cornell. That hearing began on April 16, 1996, and concluded on April 19, 1996. (Defs.' Notice of Mot. for Summ. J. Ex. N, Transcript of Disciplinary Hr'g, conducted on April 16, 18-19, 1996). Specifically, in the original complaint, plaintiff refers to the testimony given by this fellow inmate.[FN7] (Compl. at 8). That inmate testified on April 19th. (Hr'g. Tr. at 53-54, 57). Thus, plaintiff's claim that he filed the complaint between April 10-12, 1996, is absolutely impossible as the initial complaint refers to events occurring after that time period. Merely because plaintiff boldly alleges in his amended complaint that he filed the original complaint between April 10th and 12th does not require this Court to turn a blind eye to plaintiff's prior pleadings demonstrating the absurdity of his claim.[FN8] *See, Silva Run Worlwide Ltd. v. Gaming Lottery Corp.,* 2001 WL 396521, *1 (S.D.N.Y. April 19, 2001) (citations omitted) (A court should not "accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court.").

FN7. In the complaint, plaintiff alleges "that at his S.H.U. hearing petitioner called as a witness Robert Cornell who stated that this petitioner Mingues nor his wife (co-petitioner) Narvaez ever took any money from him. (Compl. at 8).

FN8. At his deposition, plaintiff testified that he filed the initial complaint "[a]pproximately around June of 1996." (Mingues Dep. at 37-38).

Lawsuits by inmates represented by counsel are commenced when the complaint is filed with the court. *See,* Fed.R.Civ.P. 3, 5(e). For *pro se* litigants, who are not imprisoned and have been granted *in forum pauperis* relief, their complaints are deemed filed when received by the Pro Se Office. *See,* Toliver v. County of Sullivan, 841 F.2d 41 (2d Cir.1998). The complaint of a *pro se* prisoner, however, is deemed filed when he or she gives the complaint to prisoner officials to be mailed. *Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993), *modified on other grounds,* 25 F.3d 81 (2d Cir.1994). The "prison mailbox" rule is designed to combat inmate litigants' dependence on the prison facility's mail system and their lack of counsel so as to assure the timely filing of their legal papers with the court. *Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir.2001) (citations omitted). Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed. *See e.g., Forster v. Bigger,* 2003 WL 22299326, *2 (S.D.N.Y. Oct.7, 2003); *Hosendove v. Myers,* 2003 WL 22216809, *2 (D.Conn. Sept.19, 2003); *Hayes v. N .Y.S. D.O.C. Officers,* 1998 WL 901730, *3 (S.D.N.Y. Dec.28, 1998); *Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) (cases cited therein).

**\*4** In response to the Report and Recommendation, plaintiff asserts that, in April, the original complaint "was placed in the facility mail box." (Pl.'s Objection to Report at 1). However, it is uncontested that plaintiff's wife signed the complaint on May 8th; it was received by the Pro Se Office on May 10th; and plaintiff's signature is dated May 13th. There is no explanation offered that could reasonably support and account for the existence of these May dates on a complaint which plaintiff falsely claims to have deposited to be mailed during the period of April 10th and April 12th. Had plaintiff mailed the complaint directly to the court prior to April 26th, it would have been impossible for the plaintiff's wife to have signed the document two

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

days prior to the date that the Pro Se Office stamped it received on May 10th.[FN9] Moreover, absent evidence to the contrary, applying the mailbox rule would presume that plaintiff gave his complaint to prison officials on May 13, 1996, the date he signed it. *See, Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001) (quoting *Torres,* 33 F.Supp.2d at 270). Even if the Court gave plaintiff the benefit of the date plaintiff's wife signed the complaint, *i.e.,* the earliest date reflected on the filed complaint, it was still after the effective date of the PLRA. Hence, plaintiff is legally obligated to have pursued his prison grievance procedures prior to filing the instant action. The plaintiff has offered no explanation for the initial complaint's reference to events that occurred after the date he claims he filed it, the two May dates on which he and his former co-plaintiff wife signed the complaint, or the May date stamped received by the Pro Se Office. As the magistrate Judge observed:

> FN9. The benefit of the mailbox rule does not apply where the plaintiff delivers the complaint to someone outside the prison system to forward to the court. *Knickerbocker v. Artuz,* 271 F.3d 35, 37 (2d Cir.2001).

Apart from the allegation that certain events giving rise to the claims occurred on April 9, 1996, the Original Complaint contains no mention of dates in April, 1996. Mingues no where explains the contradiction between the signature dates on the Original Complaint and the allegations contained in Amended Complaint. (Report at 12).

New York state law provides a three tier grievance procedure applicable to plaintiff's claims of excessive force. *See,* N.Y. Correct. Law § 139 (McKinnney's 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2003); *Mendoz v. Goord,* 2002 WL 31654855 (S.D.N.Y. Nov.21, 2002); *Rodriguez v. Hahn,* 209 F.Supp.2d 344 (S.D.N.Y.2002). Plaintiff has not denied knowledge of the grievance procedure at his institution, nor claimed that anything or anyone caused him not to file a grievance and completely pursue it through the administrative process.[FN10] The magistrate judge's determination that the defendants' Rule 12(b) motion should be denied because of an "absence of a clear record" contrary to plaintiff's express allegation in the amended complaint that he

commenced the action before April 26, 1996 is erroneous. The Court could have *sua sponte* dismiss this action as the record is unmistakably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA. *See, Mojias v. Johnson,* 351 F.3d 606 (2003); *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999). In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear.

> FN10. In the original complaint, plaintiff stated he did not file a grievance, pursuant to the state's prisoner grievance procedure, "because this matter can not be dealt with by interdepartmental grievances." (Compl. at 2-3). In plaintiff's attorney's memorandum in opposition to the motion to dismiss, counsel contends that plaintiff is not required to file a grievance because the state's prison system provides extremely limited administrative remedies and money damages, which plaintiff seeks, are not available.

**5** Accordingly, it is hereby

ORDERED that the Report and Recommendation is not adopted; and it is further

ORDERED that the defendants' motion to dismiss the complaint is granted.

S.D.N.Y.,2004.
Mingues v. Nelson
Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Roger SULTON, Plaintiff,
v.
Charles GREINER, Superintendent of Sing Sing Corr.
Fac., Doctor Halko & P.A. Williams of Sing Sing Corr.
Fac. Medical Department, Doctor Lofton, Defendants.
**No. 00 Civ. 0727(RWS).**

Dec. 11, 2000.

Roger Sulton, Wende Correctional Facility, Alden, NY,
Plaintiff, pro se.

Honorable Eliot Spitzer, Attorney General of the State of
New York, New York, NY, By: S. Kenneth Jones,
Assistant Attorney General, for Defendants, of counsel.

*OPINION*

SWEET, J.

**\*1** Defendants Charles Greiner ("Greiner"), past
Superintendent of Sing Sing Correctional Facility ("Sing
Sing") and Dr. Nikulas Halko, ("Halko"), P.A. Williams
("Williams"), and Dr. Lofton ("Lofton"), all of the Sing
Sing Medical Department, (collectively, the
"Defendants"), have moved to dismiss the amended
complaint of *pro se* inmate Roger Sulton ("Sulton"),
pursuant to Fed.R.Civ.P. 12(b)(6) and 12(h)(2) for failure
to exhaust administrative remedies. For the reasons set
forth below, the motion will be granted.

*Prior Proceedings*

Sulton filed the complaint in this action on February 2,
2000, asserting a claim against the Defendants under
Section 1983 for alleged violation of his constitutional
rights under the Eighth Amendment for acting with
deliberate indifference to his serious medical needs.
Sulton filed an amended complaint on May 3, 2000, to
identify additional defendants to his suit. Additionally,
Sulton alleges negligent malpractice by the Sing Sing
medical staff. Sulton seeks monetary damages. The instant
motion was filed on August 9, 2000, and was marked fully
submitted on September 6, 2000.

*Facts*

The Defendants' motion comes in the posture of a motion
to dismiss for failure to state a claim, pursuant to Federal
Rule of Civil Procedure 12(b)(6). However, both the
Defendants and Sulton have submitted materials outside
the pleadings. Where a District Court is provided with
materials outside the pleadings in the context of a 12(b)(6)
motion to dismiss, it has two options: the court may
exclude the additional materials and decide the motion on
the complaint alone or convert the motion to one for
summary judgment. *See* Fed.R.Civ.P. 12(b); *Kopec v.
Coughlin, 922 F.2d 152, 154 (2d Cir.1991); Fonte v.
Board of Managers of Continental Towers Condominium,
848 F.2d 24, 25 (2d Cir.1988).* The Court has determined
to treat the instant motion as a motion for summary
judgment. Therefore, the following facts are gleaned from
the parties' submissions, with all inferences drawn in favor
of the non-movant as required on a motion for summary
judgment. They are not findings of fact by the Court.

Sulton is a prison inmate who was incarcerated in Sing
Sing at the time of the incidents in question. Greiner was
Superintendent of Sing Sing at that time. Halko was and is
a doctor on medical staff at Sing Sing. Williams and
Lofton are alleged to be affiliated with the Sing Sing
Medical Department.

According to Sulton, on October 8, 1998, he slipped on a
flight of wet stairs, where there was no "wet floor" sign
posted, and injured his left knee. The next day his knee
was swollen and the pain "was real bad." That same day

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

Sulton went to sick call and saw P.A. Williams. Williams ordered x-rays and also ordered "no-work, feed-in cell, pain killers and a cane" for Sulton. The swelling went down, but the pain got stronger.

For four months Sulton complained to the Sing Sing medical staff about his pain. During this time his left knee would give out "at any time." Yet, "nothing was done." However, the Sing Sing Medical Department did send Sulton to the Green Haven Correctional Facility for an M.R.I. and, subsequently, knee surgery was recommended by an attending physician on April 23, 1999. A hinged knee brace was recommended for post-surgery recovery.

**\*2** At some point thereafter, Sulton wrote to Greiner concerning his medical problem and he was placed on "a call-out" to see Halko. Halko then informed Sulton that he would not be going for surgery because Correctional Physician Services [FN1] ("CPS") would not allow it. CPS wanted the inmate to undergo physical therapy before they would approve surgery. Sulton continued to be in pain and requested outside medical care from Williams. However, Williams could not do anything about Sulton's surgery until it was approved by CPS.

> FN1. CPS is the health maintenance organization which must pre-approve any outside medical service to be provided to inmates outside of the correctional facility.

In September 1999, Sulton was transferred to Wende Correctional Facility ("Wende"). The medical department there provided him with physical therapy for his left knee, which was "still in constant pain" and was prone to giving out beneath his body weight.

Sulton filed grievance # 14106-99 on November 3, 1999, and on November 24, 1999, he received a response from the Inmate Grievance Resolution Committee (the "IGRC"). Sulton contends that on that same date he indicated his desire to appeal their decision to the Superintendent. Sulton did not appeal his grievance to the highest level of administrative review, the Central Office Review Committee (the "CORC"). In a letter to Wende Superintendent Donnelly ("Donnelly") dated December

17, 2000, Sulton complained that he never received a response to his appeal of the IGRC decision. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly stated that he concurred with the IGRC's decision.

In January 2000, "plaintiff['s] legs gave out and the right leg took the weight of the body ... causing the plaintiff to suffer ... torn joints in the ankle area." Surgery was performed on the ankle and he was placed on "medical confinement status."

*Discussion*

I. *This Action Will Be Dismissed For Plaintiff's Failure To Comply With The Prison Litigation Reform Act Of 1996*

In his amended complaint, Sulton alleges that he filed a grievance and, although initially the Defendants were unable to identify the grievance, by his opposition to the instant motion Sulton has identified the process he undertook to pursue his grievance.

Section 1997e(a) of the Prison Litigation Reform Act (the "PLRA") provides that:

No action shall be brought with respect to prison conditions under ... 42 U.S.C. § 1983 ... or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

In enacting Section 1997e(a), Congress made exhaustion mandatory. *Salahuddin v. Mead,* 174 F.3d 271, 274-75 (2d Cir.1999). As a result, where an inmate fails to satisfy the PLRA's exhaustion requirement, the complaint must be dismissed. *See, e.g., Santiago v. Meinsen,* 89 F.Supp.2d 435, 439-40 (S.D.N.Y.2000) (citations omitted).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

In New York, the relevant administrative vehicle is the Inmate Grievance Program ("IGP"). *See* N.Y. Correct. Law § 139 (directing Commissioner of the Department of Correctional Services to establish a grievance mechanism in each correctional facility under the jurisdiction of the Department); N.Y. Comp.Codes R. & Regs., tit. 7, § 701.1 (instituting IGP). New York inmates can file internal grievances with the inmate grievance committee on practically any issue affecting their confinement. *See In re Patterson,* 53 N.Y.2d 98, 440 N.Y.S.2d 600 (N.Y.1981) (interpreting N.Y. Correct. Law § 139 broadly); N.Y. Comp.Codes R. & Regs., tit. 7, §§ 701.2(a) (inmates may file grievances about the "substance or application of any written or unwritten policy, regulation, procedure or rule of the Department of Correctional Services ...") and 701.7 (procedures for filing, time limits, hearings and appeals).

**\*3** The New York State Department of Correctional Services ("DOCS") has established a grievance program with specific procedures which must be followed in order for a prisoner to exhaust his administrative remedies. *See Petit v. Bender,* No. 99 Civ. 0969. 2000 WL 303280, at *2- *3 (S.D.N.Y. March 22, 2000) (holding that prisoner failed to exhaust his administrative remedies where prisoner only partially complied with the grievance procedures established by Section 701 *et seq.*). These procedures include a requirement that an inmate appeal a Superintendent's decision to the CORC by filing an appeal with the Grievance Clerk. *See* N.Y. Comp.Codes R. & Regs., tit. 7, § 701.7(c)(1).

There is, however, an additional issue to be addressed in this case, which is that the administrative remedies available to Sulton do not afford monetary relief. The Second Circuit has not yet ruled on whether the PLRA's exhaustion requirement applies where the available administrative remedies available do not provide the type of relief the prisoner seeks. *Snider v. Dylag,* 188 F.3d 51, 55 (2d Cir.1999) ("We note that it is far from certain that the exhaustion requirement of 42 U.S.C. § 1997e(a) applies to deliberate indifference claims ... under Section 1983, where the relief requested is monetary and where the administrative appeal, even if decided for the complainant, could not result in a monetary award.").

There is disagreement among the district courts within this circuit as to this issue, although there is "clear trend ... to find exhaustion applicable even where the requested relief, money damages, cannot be awarded by the administrative body hearing the complaint." *Santiago v. Meinsen,* 89 F.Supp.2d at 440; *see Snider v. Melindez,* 199 F.3d 108, 114 n. 2 (2d Cir.1999) (noting disagreement among courts as to applicability of exhaustion requirement where administrative remedies are unable to provide the relief that a prisoner seeks in his federal action); *but cf. Nussle v. Willette,* 224 F.3d 95, (2d Cir.2000) (holding that exhaustion not required for excessive force claim because such claim is not "prison conditions" suit and overruling district court decisions applying exhaustion requirement to excessive force claims seeking monetary relief).

Moreover, this Court has previously held that a prisoner must exhaust his administrative remedies before seeking relief in federal court in connection with a prison conditions claim even where a prisoner seeks damages not recoverable under an established grievance procedure. *Coronado v. Goord,* No. 99 Civ. 1674, 2000 WL 52488, at *2 (S.D.N.Y. Jan. 24, 2000); *Edney v. Karrigan,* No. 99 Civ. 1675, 1999 WL 958921, at *4 (S.D.N.Y. Oct. 14, 1999). This is the rule that will be applied here.

In his response to the motion to dismiss, Sulton indicates that he filed grievance # 14106-99 on November 3, 1999 and on November 24, 1999 he received a response IGRC and that on the same date Sulton indicated his desire to appeal their decision to the Superintendent. Sulton does not contend that he appealed his grievance to the highest level of administrative review, namely, the CORC. Instead, Sulton has asserted that Superintendent Donnelly never replied to the appeal of the IGRC decision and submits a letter dated December 17, 2000 in which Sulton complains that he never received a response from Donnelly. However, the Defendants have submitted a response from Donnelly dated December 6, 2000, in which Donnelly concurred with the decision of the IGRC denying Sulton relief. There is no evidence in the record that Sulton appealed the grievance to CORC.

**\*4** Accordingly, because Sulton failed to exhaust his administrative remedies by appealing the grievance to the CORC, his claims of medical indifference will be dismissed pursuant to 42 U.S.C. § 1997e. *See Petit,* 2000 WL 303280, at *3.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1809284 (S.D.N.Y.)
(Cite as: 2000 WL 1809284 (S.D.N.Y.))

*Conclusion*

Therefore, for the reasons set forth above, the Defendants'
motion will be granted and the amended complaint will be
dismissed without prejudice to the action being renewed
once Sulton has exhausted all administrative remedies.

It is so ordered.

S.D.N.Y.,2000.
Sulton v. Greiner
Not Reported in F.Supp.2d, 2000 WL 1809284
(S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 931729 (N.D.N.Y.)

(Cite as: 2006 WL 931729 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Anthony M. GARRAWAY, Plaintiff,
v.
BROOME COUNTY, NEW YORK; Ronald J. Bill,
Chief Civil Deputy; Broome County Sheriff's
Department; Dennis Rowlands, Deputy # 260; and Chris
Smith, Deputy # 223, Defendants.
No. 5:03-CV-0681.

April 7, 2006.
Anthony M. Garraway, Moravia, NY, pro se.

Aaron J. Marcus, Binghamton, NY, for Defendants.

### DECISION and ORDER

THOMAS J. McAVOY, Senior United States District
Judge.

## I. INTRODUCTION

*1 Plaintiff commenced this action pursuant to 42
U.S.C. § 1983 alleging that Defendants violated his Fourth
Amendment right against unreasonable search and seizures
and his Fourteenth Amendment right to equal protection
and due process. Defendants move for summary
judgement pursuant to Fed.R.Civ.P. 56 based on the
untimeliness of Plaintiff's claim and his failure to state a
cause of action. Plaintiff opposes arguing his claim is
timely under the "prison mailbox rule" and that there are
genuine issues of fact warranting a trial.

## II. BACKGROUND

Plaintiff claims that on or about May 15, 2000 he
entered into an oral agreement with Esther Gardner for a
"month-to-month lease" of a mobile home. Plaintiff
contends that he made a rent payment for the remainder of
the month and was given "the only key to the property so
he could move in." (Pl.'s Statement of Undisputed Facts at
¶ 1). Gardner, however, states she never met or talked with

Plaintiff prior to May 31, 2000 and that she did not lease
any property to him. (Gardner Aff. ¶ 9.) Gardner's
daughter, Margaret Dunn, claims that Denise Houck,
Plaintiff's then girlfriend, contacted her a few weeks prior
to May 31, 2000 about renting the property. (Dunn Aff. ¶
2.) Dunn claims she and Houck had an oral agreement that
Houck would not move in until she had paid Dunn the first
month's rent and a security deposit. Dunn gave Houck
permission to fix the property up prior to moving in and
gave Houck a key. Dunn states she never intended to rent
the property to Plaintiff, but rather to Houck and her
children. (Dunn Aff. ¶ 8.) No formal lease documents
were drawn up. There remains a factual dispute as to what
rental agreements, if any, were made between Plaintiff,
Houck, Gardner, and Dunn.

Dunn became aware that Houck had moved in without
making any rent or security deposit payments. (Dunn Aff.
¶ 5.) Dunn claims Houck told her she would have the rent
money within the next few days and, upon that belief,
Dunn allowed Houck to stay in the mobile home. Id.

On May 31, 2000, Gardner went to the mobile home
and saw that Houck and Plaintiff had moved in and had pit
bulls living on the property. Gardner claims she no longer
wanted Houck to lease the property and called the Broome
County Humane Society and the Broome County Sheriff's
Office to see what actions could be taken. (Gardner Aff. ¶
5.)

When the Humane Society arrived, Plaintiff came
outside from within the mobile home and an argument
ensued between he and Gardner as to her request for the
Humane Society to remove Plaintiff's dogs. Shortly
thereafter, Defendant Sheriff's Deputy Rowlands arrived
on the scene and claims he was advised by Gardner that
Plaintiff did not belong on the property. (Rowlands Aff. ¶
3.)

Defendant Sheriff's Chief Civil Deputy Bill claims he
responded to the scene after hearing a discussion of it on
his radio. Upon arrival, Bill claims he spoke with Gardner
who advised him that, while Plaintiff and Houck were
going to lease the property and had been given permission

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 931729 (N.D.N.Y.)

(Cite as: 2006 WL 931729 (N.D.N.Y.))

to do some work inside the home, they had not been given permission to move into the residence. Bill claims Houck told him what Gardner said was true and that no money had exchanged hands and there was no formal lease agreement. (Bill Aff. ¶ 4.) Bill claims that he then advised Houck that in his opinion she and Plaintiff were "not in the residence legally" and that they would ultimately have to leave. Bill states that he advised Houck of the legal processes by which she could contest the landlord's representations. (Bill Aff. ¶ 4.)

**\*2** Defendant Sheriff's Deputy Smith claims that upon his arrival, Rowlands was interviewing Plaintiff who stated his name was Hubert A. Garraway and was refusing to offer any form of identification. Hubert Garraway is Plaintiff's brother. (Smith Aff. ¶ 3.) Smith claims he was advised by the Humane Society employees that Plaintiff's name was Anthony Garraway and that they had a number of prior dealings with him. (Smith Aff. ¶ 4). Smith claims Plaintiff continued to give conflicting information as to his name, social security number and other identification information. Smith states that just prior to placing Plaintiff into custody on suspicion of committing criminal impersonation, he was advised of an active arrest warrant outstanding for Plaintiff from the Binghamton Police Department regarding a Criminal Mischief in the Fourth Degree charge. (Smith Aff. ¶ 6.) Smith claims he never entered or searched the mobile home.

Because Defendants suspected Plaintiff was lying about his identity, Rowlands entered the mobile home to find a form of personal identification for Plaintiff. Rowlands claims he entered the mobile home upon the belief that Plaintiff did not belong there and that Gardner had the authority to consent to the search. (Rowlands Aff. ¶ 8.) Rowlands claims the search entailed "nothing more than glancing over any papers or documents that might have been lying around the residence." (Rowlands Aff. ¶ 7.) Rowlands claims he did not remove any items from the property. *Id* .

Plaintiff offers a conflicting version of the events. Plaintiff claims that Houck was not present and that she was at work during the entire incident. Plaintiff admits he would not offer any form of identification to Defendants and that he stated he was Hubert. Plaintiff claims

Defendant Smith unlawfully entered the mobile home and returned with letters written and sent to Anthony Garraway. Plaintiff claims Rowlands also unlawfully entered the mobile home, found Plaintiff's wallet within a pair of Plaintiff's pants and removed Plaintiff's license and social security card. Plaintiff claims these identification cards were obtained from an illegal search and were illegally seized. Plaintiff claims the identification cards were taken from the property to the station where Plaintiff was processed.

It is undisputed that Plaintiff was arrested and charged with Criminal Impersonation in the Second Degree (New York Penal Law § 190.25) and Criminal Mischief in the Fourth Degree (New York Penal Law § 145.00). Following the incident, Gardner began a formal eviction proceeding and posted a 3-day notice on the door of the mobile home. Following the posting, Gardner believed no one remained in the mobile home. (Gardner Aff. ¶ 7.)

Plaintiff filed the instant claim pursuant to 42 U.S.C.1983 claiming a violation of his Constitutional Fourth Amendment right against unreasonable search and seizures and a violation of his due process right for being evicted from the property.

### III. STANDARD OF REVIEW

**\*3** It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, *see Tenenbaum v. Williams,* 193 F.3d 581, 593 (2d Cir.1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). A party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the movant is able to establish a prima facie basis for summary judgment, the burden of

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 931729 (N.D.N.Y.)

(Cite as: 2006 WL 931729 (N.D.N.Y.))

production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in his favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).* A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, *Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir.1994),* or on conclusory allegations or unsubstantiated speculation. *Scotto v.. Almenas, 143 F.3d 105, 114 (2d Cir.1998).* With this standard in mind, the Court will address Defendants' motion

**IV. DISCUSSION**

Plaintiff's Complaint alleges violations of his Constitutional right against illegal search and seizures by Defendants, and a violation of his Constitutional right to equal protection and due process by denying Plaintiff a legal eviction. (See Pl. Compl.). Plaintiff claims there was an oral rental agreement between he and Gardner and, therefore, Gardner did not have the authority to consent to a search of the mobile home. Plaintiff further claims Defendants threatened his family that if they were to return to the property they would be arrested for trespassing, thus resulting in an illegal eviction by Defendants. Defendants argue the Complaint should be dismissed because it is untimely under 42 U.S.C.S. § 1983. In addition, Defendants argue that the motion for summary judgment should be granted because no Fourth Amendment or due process rights have been violated and, assuming there was a violation, that they are entitled to qualified immunity.

*A. Timeliness of Plaintiff's Claim*

There is a three year statute of limitations for actions arising under 42 U.S.C.1983. Plaintiff's claim arose from the incidents occurring on May 31, 2000. Defendants claim the filing date of June 4, 2003 renders the Complaint untimely. However, Plaintiff, in his position of being both *pro se* and incarcerated, is afforded protection by the "prison mailbox rule". This rule is justified under the rationale that in being *pro se* and incarcerated the plaintiff has no choice but to hand his notices to prison authorities to forward to the Court Clerk. Because the plaintiff loses control over the documents and must therefore rely on prison authorities to forward them on to the clerk, Courts have recognized the date plaintiffs hand over their documents to prison authorities as the effective "filing

date", and not the date when the Court Clerk actually is in receipt of them. *See Houston v. Lack, 487 U.S. 266 (1988).*

**\*4** In the instant case, while the filing date as entered by the clerk is June 4, 2003, Plaintiff appears to have handed the Complaint over to prison officials prior to May 31, 2003, and by virtue of the "prison mailbox rule", filed the Complaint within the three year statute of limitations.[FN1]

> FN1. Respondents may, however, inquire as to the date Plaintiff actually handed over the papers and later raise this issue if it should appear that Plaintiff handed over the papers *after* May 31, 2003.

*B. Fourth Amendment right against unreasonable search and seizures*

Plaintiff claims his Fourth Amendment right against unreasonable search and seizures was violated when Defendants Rowlands and Smith, without permission from Plaintiff, unlawfully entered into the mobile home and unlawfully seized Plaintiff's property.

To claim a violation of a Fourth Amendment right against unreasonable search and seizures, Plaintiff has to show a legitimate expectation of privacy in the property. *California v. Ciraolo, 476 U.S. 207 (1986).* A legitimate expectation may be shown by establishing an actual subjective expectation of privacy and that the expectation is one that society is prepared to recognize as legitimate. *Id.* Thus, "a tenant's expectation of privacy in his apartment ceases to be 'objectively justifiable' when his occupancy ceases to be lawful, as determined by the terms of his lease...." *U.S. v. Ross, 43 Fed. Appx. 751, 757 (6th Cir.2002).* In *U.S. v. Allen, 106 F.3d 695 (6th Cir.1997),* for example, the court held a defendant lacked a legitimate expectation of privacy when he failed to remain current on his rental payments.

A search conducted without a warrant is considered per se unreasonable and, therefore, a violation of the Fourth Amendment unless the search falls within a specifically established exception. *See Katz v. United States, 389 U.S. 347 (1967).* One such exception is a warrantless search conducted with consent. *See*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 931729 (N.D.N.Y.)

(Cite as: 2006 WL 931729 (N.D.N.Y.))

*Schneckloth v. Bustamonte,* 412 U.S. 218 (1973). "The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." *Georgia v. Randolph,* ---S.Ct. ----, ----, 2006 WL 707380, at *3 (Mar. 22, 2006). Valid consent is established when one with actual authority over the property voluntarily gives consent to a search. *Schneckloth,* 412 U.S. 218. "[T]he exception for consent extends even to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant." *Randolph,* --- S.Ct. at ----, 2006 WL 707380 at *5. Generally, a lessor of real property has no authority to consent to a warrantless search of rental property which is subject to an existing lease. *See Chapman v. U.S.,* 365 U.S. 610 (1961); *U.S. v. Elliott,* 50 F.3d 180, 186 (2d Cir.1995). "A landlord does, however, have authority to consent to a search by police of dwelling units in his building that are not leased. Further, if the landlord has joint access or control over certain areas of his apartment building for most purposes, he may validly consent to a search of those areas." *Id.*

*1. Actual Authority to Consent*

**\*5** The first issue is whether Plaintiff had actual authority over the mobile home as a result of a rental agreement. Plaintiff claims there was an oral lease agreement with Gardner and that he paid rent for the month of May. Gardner claims she never made such an agreement and never received any payments from Plaintiff. Dunn claims she and Houck had an oral lease agreement but that she was not authorized to live there yet and had made no rental payments. Based on the foregoing, there is a material dispute as to whether there was a lease agreement in effect at the time of the search and whether rental payments had been made. As a result, it remains unclear as to whether Plaintiff or Gardner had actual authority over the mobile home and was, therefore, authorized to give or refuse consent to the warrantless search.

*2. Apparent Authority to Consent*

Viewing the evidence in the light most favorable to Plaintiff, the Court will assume there was a valid lease agreement. Nevertheless, the Court finds that the search of the mobile home was still valid under *Illinois v. Rodriguez,* 497 U.S. 177 (1990) and the Supreme Court's more recent decision in *Randolph.* In *Rodriguez,* the Supreme Court held that law enforcement was permitted to conduct a search upon the apparent authority of a third party's consent, even if it turns out the third party did not in fact have actual authority. *Rodriguez,* 497 U.S. 177. Law enforcement may rely on the third party's consent so long as facts available to the officer at the time of the search would warrant a "person of reasonable caution in belief that consenting party had authority over premises." *See U.S. v. Perez,* 948 F.Supp. 1191 (S.D.N.Y.1996); *see also Anderson v. Decristofalo,* 494 F.2d 321 (2d Cir.1974); *Issa v. City of Glencoe,* 118 Fed. Appx. 103 (8th Cir.2004).

Here, the issue is whether Officer Rowlands had a reasonable good faith belief that Plaintiff was not on the property legally and was not there pursuant to a lease agreement and, therefore, Gardner had the authority to consent to a warrantless search of the mobile home. Plaintiff claims that because the Officers were allegedly called to the scene because of the pit bulls, and not for a landlord/tenant dispute, their belief that Plaintiff had no legal right to be in the mobile home was unreasonable. Plaintiff claims Houck was not at the scene and Defendants could not therefore rely on her statements in determining if Plaintiff was in the mobile home legally. Defendants Smith, Rowlands and Bill claim that once each had arrived on the scene they were advised by Gardner that Plaintiff and Houck had moved into the mobile home without having permission to do so. (Smith Aff. ¶ 12, Rowlands Aff. ¶ 3, Bill Aff. ¶ 3.) Defendant Bill claims Houck was at the scene and advised him that what Gardner had said was true and that no formal lease agreement had been made and no money had exchanged hands. (Bill Aff. ¶ 4.) Irrespective of why Defendants arrived at the scene, according to their affidavits, it was clear that once they arrived they were dealing with a potential trespassing issue.

**\*6** Looking at the evidence in the light most favorable to Plaintiff, the Court will assume that Houck was not present. Similar to *Elliott* and *Decristofalo,* Gardner's

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 931729 (N.D.N.Y.)

(Cite as: 2006 WL 931729 (N.D.N.Y.))

statements to Defendant Bill could cause a reasonable officer to conclude that Plaintiff was not legally living in the property and that he was, as Defendant Bill concluded, either squatting or trespassing on the property. (Bill Aff. ¶ 5.) While Plaintiff claims he was objecting to the search and that he had a legal right to be there, Plaintiff also admitted to lying to Defendants about his true identity, for which he was charged with Criminal Impersonation in the Second Degree (N.Y.S PL § 145.00). (Smith Aff. ¶ 7, Garraway Aff. ¶ 12.) Plaintiff's continued conflicting answers to Defendants concerning his true identity gave them reasonable doubt as to his credibility in general. Therefore, this Court finds Defendant Rowlands' reliance on Gardner's representations that Plaintiff did not belong in the home, that there was not an oral lease agreement between she and Plaintiff, and that she was the true owner of the residence with authority to consent to a search thereon, was reasonable against Plaintiff's assertions. Based on the circumstances, Defendant Rowlands believed Gardner had authority to consent to the search and he searched the mobile home for information concerning Plaintiff's identity. While Plaintiff claims Smith took personal letters written by Plaintiff from the home as evidence of Plaintiff's true identity, Defendant Smith claims he never entered the mobile home. Looking at the evidence in the light most favorable to Plaintiff, and assuming that Defendant Smith searched the home as Plaintiff claims, Defendant Smith was privy to the same information that Defendant Rowlands relied on in searching the home. See *Morgan v. Superintendent,* 88 F.Supp.2d 312, 318 (S.D.N.Y.2000) ("[W]here law enforcement authorities are cooperating, the knowledge of one is presumed shared by all ..." and "[t]he determination of whether probable cause to [act] exists can be based on the collective knowledge of all the officers involved ...".). Therefore, even if Defendant Smith did search the home it was based on the reasonable belief that Gardner had authority to consent to the search.

Because entry into the mobile home by Defendants was valid upon either the actual or apparent authority to consent by Gardner, the Court finds a "good faith defense" is available to Defendants who may or may not have been deceived as to who held the true legal interest in the home. If Plaintiff never had a lease agreement with Gardner (oral or written) or if Houck had an oral agreement with Dunn

FN2 but was not yet authorized to live there, then Gardner provided actual authority to consent to the search. Assuming there was an oral agreement between Houck and Dunn or between Plaintiff and Gardner, Defendants had reasonable grounds upon which to believe there was not a valid lease agreement and, therefore, that Gardner retained authority to consent to a search of the premises. Therefore, Plaintiff's claims of violations of his Fourth Amendment rights are dismissed.

> FN2. There is no indication in the record that any agreement between Houck and Dunn contemplated Plaintiff living in the mobile home. Similarly, there is no evidence in the record that, assuming Houck was legally residing in the mobile home, she permitted Plaintiff to reside there.

*C. Due Process Rights*

**\*7** Plaintiff next claims his Constitutional rights to equal protection and due process were violated when Defendants denied him the right to a legal eviction and the right to a fair trial and hearing before a judge to determine a civil dispute. (Pl. Complaint ¶ 5.) Plaintiff alleges Defendant Bill told him "he was kicking me and my family out of the residence at the request of the landlord and that if I ever returned he would personally arrest me." (Garraway Aff. ¶ 24.) Plaintiff claims Bill's threat of arrest was an act of illegal eviction, thereby denying him the right to a legal eviction by Gardner. Defendant Bill claims he never spoke with Plaintiff that day and that at no time did he threaten Plaintiff or Houck that they would be arrested if they did not leave. (Bill Aff. ¶ 6.) Bill claims that he believed Plaintiff and Houck were squatting or trespassing and, therefore, he advised Houck that she and Plaintiff were not there legally. Bill claims he advised Houck of the process by which she could contest Gardner's representations and told her how she could get an order by the town court to allow her to stay.

A wrongful eviction action can be brought against law enforcement officals who are accused of evicting tenants for the landlord. *See Collum v. Incorp. Village of Freeport,* 691 F.Supp. 637, 641 (E.D.N.Y.1998). The court held in *Collum* that "where an officer, without an eviction warrant, gives a tenant a choice between

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 931729 (N.D.N.Y.)

(Cite as: 2006 WL 931729 (N.D.N.Y.))

absenting himself from the premises and being arrested and the tenant chooses the former, a wrongful eviction has taken place. [However] ... a finding [that the officer] threatened arrest alone would be insufficient ... the jury would have to find that the threat forced plaintiff to choose between vacating the premises and being arrested." *Id.*

Here, the issue is whether Defendant Bill evicted Plaintiff. The answer is that he did not. Plaintiff was removed from the premises based on an arrest unrelated to his presence in the mobile home (i.e ., the warrant and criminal impersonation).[FN3] Taking the evidence in the light most favorable to Plaintiff, even if Defendant Bill did threaten to arrest Plaintiff if he was to return to the property, as discussed above, Defendants had a reasonable good faith belief that Plaintiff and Houck were not there legally and, therefore, were trespassing. Any remarks Defendant Bill may have made to Plaintiff or Houck in regards to arrest were warranted as he had a good faith belief that Plaintiff was engaged in the unlawful act of squatting or trespassing. In addition, in accordance with *Collum,* mere threats of arrest are insufficient to claim wrongful eviction. *Collum,* 691 F.Supp. 637. Bill had independent grounds upon which to arrest Plaintiff and remove him from the property. Therefore, Plaintiff's claim of a violation of his due process rights by an unlawful eviction of his family by Defendants is supported by insufficient evidence.

> FN3. According to Plaintiff's version of the facts, Houck was not at the mobile home during the incident and she, therefore, would not have been subjected to removal or arrest. Even if Houck was present, as Defendants claim, Houck was not required to leave the home while the Defendants were there and was left at the home upon their departure. (Bill Aff. ¶ 7, Smith Aff. ¶ 13, Rowlands Aff. ¶ 3). In addition, there is insufficient evidence that Houck's ultimately left the mobile home as a direct result of any alleged threats of arrest made by Defendants.

### D. Qualified Immunity

**\*8** As a general rule, police officers are entitled to qualified immunity if their conduct "does not violate clearly established constitutional rights, or it was objectively reasonable for them to believe their acts did not violate those rights." *Oliveira v. Mayer,* 23 F.3d 642, 648 (2d Cir.1994). Stated another way, officers are entitled to qualified immunity from liability for violating a plaintiff's civil rights unless it was "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Groh v. Ramirez,* 540 U.S. 551, 563 (2004).

As discussed above, this Court finds it was objectively reasonable for Defendants to believe their actions were not in violation of Plaintiff's constitutional rights. The Court therefore finds Defendants are entitled to qualified immunity.

### G. Municipality Liability

Lastly, Plaintiff claims Broome County is liable for the alleged Constitutional violations by Defendants through its failure to properly train Defendants. Defendants argue Plaintiff has not shown a custom or policy adopted by the municipality which caused the alleged violations.

In § 1983 claims, municipalities may not be held responsible under a theory of *respondeat superior. Board of the County Commissioners of Bryan County, Oklahoma v. Brown,* 520 U.S. 397 (1997). To impose liability onto a municipality the plaintiff must identify a municipal "policy" or "custom" that caused plaintiff's injury. *Id.* (citing *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 694 (1978)). An act performed pursuant to a "custom" may subject a municipality to liability on the theory that the practice is so widespread so as to have force of law. Brown, 520 U.S. at 404. One way to show a custom or policy has been adopted by the municipality is to prove the municipality failed to properly train defendants. In order to show failure to train by a municipality, the plaintiff must "identify a specific deficiency in the city's training program and establish that the deficiency caused a deprivation of his constitutional rights." *City of Canton, Ohio v. Harris,* 489 U.S. 378, 391 (1989). Here, Plaintiff claims, "Broome County Sheriff Department failed to train [Defendants]." (Pl. Mem. in Opp'n. to Def. Mot. Summ. J., 9). Plaintiff further claims "[a]nytime Defendant Bill is called to a similar civil dispute ... he will always threaten and illegally evict the tenant." *Id.* Plaintiff's conclusory allegations are

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 931729 (N.D.N.Y.)

(Cite as: 2006 WL 931729 (N.D.N.Y.))

insufficient to show specific deficiencies in the municipalities training program that resulted in the alleged violations of his rights. As a result, Plaintiff has failed to provide sufficient evidence to show an ongoing, widespread policy or custom of the municipality to violate citizens' Fourth and Fourteenth rights. Therefore, Plaintiff's claim against Broome County is dismissed.

## IV. CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is GRANTED and Plaintiff's action is DISMISSED.

**\*9** IT IS SO ORDERED.

N.D.N.Y.,2006.

Garraway v. Broome County, N.Y.
Not Reported in F.Supp.2d, 2006 WL 931729 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

*1 Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681 *et seq.* ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local

Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See,e.g., Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317; *Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL
903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton,*
1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v.
O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1
n. 2 (N.D.N.Y.1998). As in the cases just cited, this court
deems as admitted all of the facts asserted in defendant's
Statement of Material Facts. The court next recites these
undisputed facts.

FN1. Amended January 1, 1999.

## BACKGROUND

*2 Plaintiff became a doctoral student in the University's
Child and Family Studies ("CFS") department in the
Spring of 1995. Successful completion of the doctoral
program required a student to (1) complete 60 credit hours
of course work; (2) pass written comprehensive
examinations ("comp.exams") in the areas of research
methods, child development, family theory and a specialty
area; (3) after passing all four comp. exams, orally defend
the written answers to those exams; (4) then select a
dissertation topic and have the proposal for the topic
approved; and (5) finally write and orally defend the
dissertation. Plaintiff failed to progress beyond the first
step.

Each student is assigned an advisor, though it is not
uncommon for students to change advisors during the
course of their studies, for a myriad of reasons. The
advisor's role is to guide the student in regard to course
selection and academic progress. A tenured member of the
CFS department, Dr. Jaipaul Roopnarine, was assigned as
plaintiff's advisor.

As a student's comp. exams near, he or she selects an
examination committee, usually consisting of three faculty
members, including the student's advisor. This committee
writes the questions which comprise the student's comp.
exams, and provides the student with guidance and
assistance in preparing for the exams. Each member of the
committee writes one exam; one member writes two. Two
evaluators grade each exam; ordinarily the faculty member
who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising
duties, was the coordinator of exams for the entire CFS
department. In this capacity, he was generally responsible
for selecting the evaluators who would grade each
student's comp. exam, distributing the student's answer to
the evaluators for grading, collecting the evaluations, and
compiling the evaluation results.

The evaluators graded an exam in one of three ways:
"pass," "marginal" or "fail." A student who received a
pass from each of the two graders passed that exam. A
student who received two fails from the graders failed the
exam. A pass and a marginal grade allowed the student to
pass. A marginal and a fail grade resulted in a failure. Two
marginal evaluations may result in a committee having to
decide whether the student would be given a passing
grade. In cases where a student was given both a pass and
a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions
independently of each other, and no indication of the
student's identity was provided on the answer. [FN2] The
coordinator, Roopnarine, had no discretion in compiling
these grades-he simply applied the pass or fail formula
described above in announcing whether a student passed
or failed the comp. exams. Only after a student passed all
four written exam questions would he or she be permitted
to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of
the evaluators may have written the question, and
the question may have been specific to just that
one student, one of the two or three evaluators
may have known the student's identity regardless
of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took
the comp. exams in October of 1996. Plaintiff passed two
of the exams, family theory and specialty, but failed two,
child development and research methods. On each of the
exams she failed, she had one marginal grade, and one
failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

FN3. Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

**\*4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> [FN4.] Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U .S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

> FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the *respondeat superior* principles which ordinarily govern Title IX actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

> It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See, e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs.,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional teasing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *SeeOncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.Accord Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See, e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *See Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' ' are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at \*5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at \*6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *see supra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there has been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *See Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *see supra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.<sup>FN9</sup>

FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See* *Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

CONCLUSION

*10 For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



137 Fed.Appx. 409, 2005 WL 1498456 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)

(Cite as: 137 Fed.Appx. 409, 2005 WL 1498456 (C.A.2 (N.Y.)))

C

This case was not selected for publication in the Federal Reporter.

United States Court of Appeals,

Second Circuit.
Pawel CZERNICKI, Plaintiff-Appellant,
v.
UNITED STATES DEPARTMENT OF JUSTICE,
Defendant-Appellee.
Docket No. 04-4058-CV.

June 24, 2005.

**Background:** Federal prisoner brought tort claim against government under Federal Tort Claims Act (FTCA). The United States District Court for the Eastern District of New York, John Gleeson, J., dismissed complaint for lack of subject matter jurisdiction. Prisoner appealed.

**Holding:** The Court of Appeals held that prisoner did not show extraordinary circumstances to entitle him to equitable tolling of two-year limitations period on presenting claim to federal agency.

Affirmed.

West Headnotes

**[1] United States 393** 〰 **113**

393 United States

393VIII Claims Against United States
393k113 k. Presentation, Allowance, and Adjustment. Most Cited Cases
Federal prisoner was not entitled to equitable tolling of two-year limitations period in which to file administrative claim with federal agency under Federal Tort Claims Act (FTCA) absent showing that extraordinary circumstances prevented his timely filing. 28

U.S.C.A. § 2401(b).

**[2] Federal Courts 170B** 〰 **752**

170B Federal Courts

170BVIII Courts of Appeals
170BVIII(K) Scope, Standards, and Extent
170BVIII(K)1 In General
170Bk752 k. Matters or Evidence Considered. Most Cited Cases
New evidence presented by federal prisoner for first time on appeal would not be considered in reviewing dismissal of his Federal Tort Claims Act (FTCA) complaint. 28 U.S.C.A. §§ 1346, 2671 et seq.

**\*410** Pawel Czernicki, Brooklyn, New York, for the Appellant, pro se.

Warshawsky, Steven M., Assistant United States Attorney, Eastern District of New York (Steven Kim, Assistant United States Attorney, Roslynn R. Mauskopf, United States Attorney for the Eastern District of New York, on the brief), Brooklyn, New York, for the Appellee, of counsel.

Present: MINER, STRAUB, Circuit Judges, and KEENAN,FN* District Judge.

FN* The Honorable John F. Keenan, United States District Judge, Southern District of New York, sitting by designation.

**SUMMARY ORDER**

**\*\*1** AFTER ARGUMENT AND UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the judgment of the district court be, and it hereby is, AFFIRMED.

Plaintiff-Appellant Pawel Czernicki ("Czernicki") appeals from the November 18, 2003 judgment of the United States District Court for the Eastern District of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

137 Fed.Appx. 409, 2005 WL 1498456 (C.A.2 (N.Y.))
(Not Selected for publication in the Federal Reporter)

(Cite as: 137 Fed.Appx. 409, 2005 WL 1498456 (C.A.2 (N.Y.)))

New York (John Gleeson, *Judge*), which granted Defendant-Appellee's motion to dismiss the amended complaint for lack of subject matter jurisdiction. We assume the parties' familiarity with the facts of this case, its procedural posture, and the decision below.

When reviewing a district court's dismissal for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1), this Court reviews factual findings for clear error and legal conclusions *de novo*. *Close v. New York,* 125 F.3d 31, 35-36 (2d Cir.1997) (citations omitted). Under the Federal Tort Claims Act ("FTCA"), "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues ...," 28 U.S.C. § 2401(b), and we have explained that, "[u]nless a plaintiff complies with that requirement, a district court lacks subject matter jurisdiction over a plaintiff's FTCA claim," *Johnson v. Smithsonian Inst.,* 189 F.3d 180, 189 (2d Cir.1999). For substantially the same reasons provided by the District Court, we hold that Czernicki has failed to demonstrate that he filed an administrative claim within the two-year statute of limitations under the FTCA.

[1][2] Moreover, we agree with the District Court's finding that the doctrine of equitable tolling should not apply in this case. We have applied the doctrine of equitable tolling in "rare and exceptional circumstances," where we found that "extraordinary circumstances" prevented a party from timely performing a required act and that party "acted with reasonable diligence throughout the period he [sought] to toll." *Doe v. Menefee,* 391 F.3d 147, 159-60 (2d Cir.2004). In *Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 96, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990), the Supreme Court explained that the doctrine of equitable tolling can apply to cases filed against the United States, and that it is within the discretion of the district court to equitably toll the statute of limitations "where the claimant has actively pursued his judicial remedies by filing a defective **411 pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." In *Kronisch v. United States,* 150 F.3d 112, 123 (2d Cir.1998), we explained that the FTCA's limitations period "will be

equitably tolled so long as defendants' concealment of their wrongdoing prevented plaintiff from becoming aware of, or discovering through the exercise of reasonable diligence, his cause of action." The record clearly indicates that Czernicki failed to file a timely administrative claim, and he presented no evidence to the District Court demonstrating that extraordinary circumstances warrant the tolling of the statutory period. FN1

FN1. For the first time, Czernicki submits in his appeal the declaration of fellow inmate Ron Reale, which suggests that Czernicki was dissuaded by prison officials from filing an FTCA claim. The Government subsequently moved to strike the declaration as new evidence that was not first presented to the District Court. We grant the Government's motion and decline to consider this evidence for the first time on appeal. *See Amalgamated Clothing & Textile Workers Union v. Wal-Mart Stores, Inc.,* 54 F.3d 69, 72-73 (2d Cir.1995) (declining to consider appellant's argument not raised in district court absent a showing of manifest injustice or extraordinary need).

**2 We have considered all of Czernicki's claims on this appeal and find that each of them is unavailing. Accordingly, the Government's motion to strike Mr. Reale's declaration is GRANTED and the District Court's order dismissing the amended complaint for lack of subject matter jurisdiction is AFFIRMED.

C.A.2 (N.Y.),2005.

Czernicki v. U.S. Dept. of Justice
137 Fed.Appx. 409, 2005 WL 1498456 (C.A.2 (N.Y.))
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Jerome WALDO, Plaintiff,
v.
Glenn S. GOORD, Acting Commissioner of New York
State Department of Correctional Services; Peter J.
Lacy, Superintendent at Bare Hill Corr. Facility;
Wendell Babbie, Acting Superintendent at Altona Corr.
Facility; and John Doe, Corrections Officer at Bare Hill
Corr. Facility, Defendants.
**No. 97-CV-1385 LEK DRH.**

Oct. 1, 1998.

Jerome Waldo, Plaintiff, pro se, Mohawk Correctional
Facility, Rome, for Plaintiff.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Albany, Eric D. Handelman, Esq., Asst.
Attorney General, for Defendants.

DECISION AND ORDER

KAHN, District J.

**\*1** This matter comes before the Court following a
Report-Recommendation filed on August 21, 1998 by the
Honorable David R. Homer, Magistrate Judge, pursuant to
28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern
District of New York.

No objections to the Report-Recommendation have been
raised. Furthermore, after examining the record, the Court
has determined that the Report-Recommendation is not
clearly erroneous. See Fed.R.Civ.P. 72(b), Advisory

Committee Notes. Accordingly, the Court adopts the
Report-Recommendation for the reasons stated therein.

Accordingly, it is

ORDERED that the Report-Recommendation is
APPROVED and ADOPTED; and it is further

ORDERED that the motion to dismiss by defendants is
GRANTED; and it is further

ORDERED that the complaint is dismissed without
prejudice as to the unserved John Doe defendant pursuant
to Fed.R.Civ.P. 4(m), and the action is therefore dismissed
in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all
parties by regular mail.

IT IS SO ORDERED.
HOMER, Magistrate J.

REPORT-RECOMMENDATION AND ORDER FN1

FN1. This matter was referred to the undersigned
pursuant to 28 U.S.C. § 636(b) and
N.D.N.Y.L.R. 72.3(c).

The plaintiff, an inmate in the New York Department of
Correctional Services ("DOCS"), brought this pro se
action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that
while incarcerated in Bare Hill Correctional Facility
("Bare Hill") and Altona Correctional Facility ("Altona"),
defendants violated his rights under the Eighth and
Fourteenth Amendments.FN2 In particular, plaintiff alleges
that prison officials maintained overcrowded facilities
resulting in physical and emotional injury to the plaintiff

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

and failed to provide adequate medical treatment for his injuries and drug problem. Plaintiff seeks declaratory relief and monetary damages. Presently pending is defendants' motion to dismiss pursuant to Fed.R.Civ.P. 12(b). Docket No. 18. For the reasons which follow, it is recommended that the motion be granted in its entirety.

FN2. The allegations as to Bare Hill are made against defendants Goord, Lacy, and Doe. Allegations as to Altona are made against Goord and Babbie.

### I. Background

Plaintiff alleges that on August 21, 1997 at Bare Hill, while he and two other inmates were playing cards, an argument ensued, and one of the two assaulted him. Compl., ¶ 17. Plaintiff received medical treatment for facial injuries at the prison infirmary and at Malone County Hospital. *Id.* at ¶¶ 18-19. On September 11, 1997, plaintiff was transferred to Altona and went to Plattsburgh Hospital for x-rays several days later. *Id.* at ¶ 21.

Plaintiff's complaint asserts that the overcrowded conditions at Bare Hill created a tense environment which increased the likelihood of violence and caused the physical assault on him by another inmate. *Id.* at ¶¶ 10-11. Additionally, plaintiff contends that similar conditions at Altona caused him mental distress and that he received constitutionally deficient medical treatment for his injuries. *Id.* at ¶¶ 21-22. The complaint alleges that Altona's lack of a drug treatment program and a dentist or specialist to treat his facial injuries constitutes cruel and unusual punishment under the Eighth and Fourteenth Amendments. *Id.* at ¶¶ 22, 27-28.

### II. Motion to Dismiss

**\*2** When considering a Rule 12(b) motion, a court must assume the truth of all factual allegations in the complaint and draw all reasonable inferences from these facts in favor of the plaintiff. *Leeds v. Meltz,* 85 F.3d 51, 53 (2d Cir.1996). The complaint may be dismissed only when "it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Staron v. McDonald's Corp.,* 51 F.3d 353, 355 (2d Cir.1995) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "The issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed, it may appear on the face of the pleading that a recovery is very remote and unlikely, but that is not the test." *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (citations omitted). This standard receives especially careful application in cases such as this where a pro se plaintiff claims violations of his civil rights. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.), *cert. denied,* 513 U.S. 836, 115 S.Ct. 117, 130 L.Ed.2d 63 (1994).

### III. Discussion

### A. Conditions of Confinement

Defendants assert that plaintiff fails to state a claim regarding the conditions of confinement at Bare Hill and Altona. For conditions of confinement to amount to cruel and unusual punishment, a two-prong test must be met. First, plaintiff must show a sufficiently serious deprivation. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citing *Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Rhodes v. Chapman,* 452 U.S. 347, 348 (1981)(denial of the "minimal civilized measure of life's necessities"). Second, plaintiff must show that the prison official involved was both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed]" and that the official drew the inference. *Farmer,* 511 U.S. at 837.

### 1. Bare Hill

In his Bare Hill claim, plaintiff alleges that the overcrowded and understaffed conditions in the dormitory-style housing "resulted in an increase in tension, mental anguish and frustration among prisoners, and dangerously increased the potential for violence." Compl.,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

¶ 11. Plaintiff asserts that these conditions violated his constitutional right to be free from cruel and unusual punishment and led to the attack on him by another prisoner. The Supreme Court has held that double-celling to manage prison overcrowding is not a per se violation of the Eighth Amendment. *Rhodes,* 452 U.S. at 347-48. The Third Circuit has recognized, though, that double-celling paired with other adverse circumstances can create a totality of conditions amounting to cruel and unusual punishment. *Nami v. Fauver,* 82 F.3d 63, 67 (3d Cir.1996). While plaintiff here does not specify double-celling as the source of his complaint, the concerns he raises are similar. Plaintiff alleges that overcrowding led to an increase in tension and danger which violated his rights. Plaintiff does not claim, however, that he was deprived of any basic needs such as food or clothing, nor does he assert any injury beyond the fear and tension allegedly engendered by the overcrowding. Further, a previous lawsuit by this plaintiff raised a similar complaint, that double-celling and fear of assault amounted to cruel and unusual punishment, which was rejected as insufficient by the court. *Bolton v. Goord,* 992 F.Supp. 604, 627 (S.D.N.Y.1998). The court there found that the fear created by the double-celling was not "an objectively serious enough injury to support a claim for damages." *Id.* (citing *Doe v. Welborn,* 110 F.3d 520, 524 (7th Cir.1997)).

**\*3** As in his prior complaint, plaintiff's limited allegations of overcrowding and fear, without more, are insufficient. *Compare Ingalls v. Florio,* 968 F.Supp. 193, 198 (D.N.J.1997) (Eighth Amendment overcrowding claim stated when five or six inmates are held in cell designed for one, inmates are required to sleep on floor, food is infested, and there is insufficient toilet paper) *and Zolnowski v. County of Erie,* 944 F.Supp. 1096, 1113 (W.D.N.Y.1996) (Eighth Amendment claim stated when overcrowding caused inmates to sleep on mattresses on floor, eat meals while sitting on floor, and endure vomit on the floor and toilets) *with Harris v. Murray,* 761 F.Supp. 409, 415 (E.D.Va.1990) (No Eighth Amendment claim when plaintiff makes only a generalized claim of overcrowding unaccompanied by any specific claim concerning the adverse effects of overcrowding). Thus, although overcrowding could create conditions which might state a violation of the Eighth Amendment, plaintiff has not alleged sufficient facts to support such a finding here. Plaintiff's conditions of confinement claim as to Bare

Hill should be dismissed.

2. Altona

Plaintiff also asserts a similar conditions of confinement claim regarding Altona. For the reasons discussed above, plaintiff's claim that he suffered anxiety and fear of other inmates in the overcrowded facility (Compl., ¶¶ 21-22) is insufficient to establish a serious injury or harm.

Plaintiff's second claim regarding Altona relates to the alleged inadequacies of the medical treatment he received. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The two-pronged *Farmer* standard applies in medical treatment cases as well. *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998). Therefore, plaintiff must allege facts which would support a finding that he suffered a sufficiently serious deprivation of his rights and that the prison officials acted with deliberate indifference to his medical needs. *Farmer,* 511 U.S. at 834.

Plaintiff alleges that the medical treatment available at Altona was insufficient to address the injuries sustained in the altercation at Bare Hill. Specifically, plaintiff cites the lack of a dentist or specialist to treat his facial injuries as an unconstitutional deprivation. Plaintiff claims that the injuries continue to cause extreme pain, nosebleeds, and swelling. Compl., ¶¶ 22 & 26. For the purposes of the Rule 12(b) motion, plaintiff's allegations of extreme pain suffice for a sufficiently serious deprivation. *See Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996).

Plaintiff does not, however, allege facts sufficient to support a claim of deliberate indifference by the named defendants. To satisfy this element, plaintiff must demonstrate that prison officials had knowledge of facts from which an inference could be drawn that a "substantial risk of serious harm" to the plaintiff existed and that the officials actually drew the inference. *Farmer,* 511 U.S. at 837. Plaintiff's complaint does not support, even when liberally construed, any such conclusion. Plaintiff offers

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

no evidence that the Altona Superintendent or DOCS Commissioner had any actual knowledge of his medical condition or that he made any attempts to notify them of his special needs. Where the plaintiff has not even alleged knowledge of his medical needs by the defendants, no reasonable jury could conclude that the defendants were deliberately indifferent to those needs. *See Amos v. Maryland Dep't of Public Safety and Corr. Services,* 126 F.3d 589, 610-11 (4th Cir.1997), *vacated on other grounds,*524 U.S. 935, 118 S.Ct. 2339, 141 L.Ed.2d 710 (1998).

**\*4** Plaintiff's second complaint about Altona is that it offers "no type of state drug treatment program for the plaintiff." Compl., ¶ 22. Constitutionally required medical treatment encompasses drug addiction therapy. *Fiallo v. de Batista,* 666 F.2d 729, 731 (1st Cir.1981); *Inmates of Allegheny County Jail v. Pierce,* 612 F.2d 754, 760-61 (3d Cir.1979). As in the *Fiallo* case, however, plaintiff falls short of stating an Eighth Amendment claim as he "clearly does not allege deprivation of essential treatment or indifference to serious need, only that he has not received the type of treatment which he desires." *Id.* at 731. Further, plaintiff alleges no harm or injury attributable to the charged deprivation. Plaintiff has not articulated his reasons for desiring drug treatment or how he was harmed by the alleged deprivation of this service. *See Guidry v. Jefferson County Detention Ctr.,* 868 F.Supp. 189, 192 (E.D.Tex.1994) (to state a section 1983 claim, plaintiff must allege that some injury has been suffered).

For these reasons, plaintiff's Altona claims should be dismissed.

B. Failure to Protect

Defendants further assert that plaintiff has not established that any of the named defendants failed to protect the plaintiff from the attack by the other inmate at Bare Hill. Prison officials have a duty "to act reasonably to ensure a safe environment for a prisoner *when they are aware* that there is a significant risk of serious injury to that prisoner." *Heisler v. Kralik,* 981 F.Supp. 830, 837 (S.D.N.Y.1997) (emphasis added); *see also Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 519 (2d

Cir.1986). This duty is not absolute, however, as "not ... every injury suffered by one prisoner at the hands of another ... translates into constitutional liability." *Farmer,* 511 U.S. at 834. To establish this liability, *Farmer's* familiar two-prong standard must be satisfied.

As in the medical indifference claim discussed above, plaintiff's allegations of broken bones and severe pain from the complained of assault suffice to establish a "sufficiently serious" deprivation. *Id.* Plaintiff's claim fails, however, to raise the possibility that he will be able to prove deliberate indifference to any threat of harm to him by the Bare Hill Superintendent or the DOCS Commissioner. Again, plaintiff must allege facts which establish that these officials were aware of circumstances from which the inference could be drawn that the plaintiff was at risk of serious harm and that they actually inferred this. *Farmer,* 511 U.S. at 838.

To advance his claim, plaintiff alleges an increase in "unusual incidents, prisoner misbehaviors, and violence" (Compl., ¶ 12) and concludes that defendants' continued policy of overcrowding created the conditions which led to his injuries. Compl., ¶ 10. The thrust of plaintiff's claim seems to suggest that the defendants' awareness of the problems of overcrowding led to knowledge of a generalized risk to the prison population, thus establishing a legally culpable state of mind as to plaintiff's injuries. Plaintiff has not offered any evidence, however, to support the existence of any personal risk to himself about which the defendants could have known. According to his own complaint, plaintiff first encountered his assailant only minutes before the altercation occurred. Compl., ¶ 17. It is clear that the named defendants could not have known of a substantial risk to the plaintiff's safety if the plaintiff himself had no reason to believe he was in danger. *See Sims v. Bowen,* No. 96-CV-656, 1998 WL 146409, at *3 (N.D.N.Y. Mar.23, 1998)(Pooler, J.)("I conclude that an inmate must inform a correctional official of the basis for his belief that another inmate represents a substantial threat to his safety before the correctional official can be charged with deliberate indifference"); *Strano v. City of New York,* No. 97-CIV-0387, 1998 WL 338097, at *3-4 (S.D.N.Y. June 24, 1998) (when plaintiff acknowledged attack was "out of the blue" and no prior incidents had occurred to put defendants on notice of threat or danger, defendants could not be held aware of any substantial risk

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)
(Cite as: 1998 WL 713809 (N.D.N.Y.))

of harm to the plaintiff). Defendants' motion on this ground should, therefore, be granted.

#### IV. Failure to Complete Service

**\*5** The complaint names four defendants, including one "John Doe" Correctional Officer at Bare Hill. Defendants acknowledge that service has been completed as to the three named defendants. Docket Nos. 12 & 13. The "John Doe" defendant has not been served with process or otherwise identified and it is unlikely that service on him will be completed in the near future. *See* Docket No. 6 (United States Marshal unable to complete service on "John Doe"). Since over nine months have passed since the complaint was filed (Docket No. 1) and summonses were last issued (Docket entry Oct. 21, 1997), the complaint as to the unserved defendant should be dismissed without prejudice pursuant to Fed.R.Civ.P. 4(m) and N.D .N.Y.L.R. 4.1(b).

#### V. Conclusion

WHEREFORE, for the reasons stated above, it is

RECOMMENDED that defendants' motion to dismiss be GRANTED in all respects; and

IT IS FURTHER RECOMMENDED that the complaint be dismissed without prejudice as to the unserved John Doe defendant pursuant to Fed.R.Civ.P. 4(m) and N.D.N.Y.L.R. 4.1(b); and it is

ORDERED that the Clerk of the Court serve a copy of this Report-Recommendation and Order, by regular mail, upon parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v.*

*Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1998.
Waldo v. Goord
Not Reported in F.Supp.2d, 1998 WL 713809 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp., 1998 WL 146688 (S.D.N.Y.)

(Cite as: 1998 WL 146688 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Rufus GIBSON, Plaintiff,
v.
The City of New York; Warden Ortiz; Deputy Warden
Edwin Knight; Deputy Warden Clyton Eastmond; John
Doe Area Captains (of assigned posts at times of
violations of Block 5 South in Otis Bantum Correctional
Center CPSU); John Doe Captain (Badge # 878); and
John Doe Official, Defendants.
No. 96 CIV. 3409(DLC).

March 25, 1998.

Rufus Gibson, Pro Se, Fishkill Correctional Facility,
Beacon.

Jeffrey Friedlander, Esq., Acting Corporation Counsel for
the City of New York, New York, By Renee Nebens, Esq.,
Assistant Corporation Counsel.

OPINION AND ORDER

COTE, District J.

   *1 On May 9, 1996, Rufus Gibson ("Gibson") filed
this action pursuant to Section 1983 claiming that the
defendants had violated his Fourteenth Amendment rights
while he was a pretrial detainee, by subjecting him to
unconstitutional conditions of confinement and by
depriving him of due process prior to a disciplinary
confinement.[FN1] On May 9, 1996, Chief Judge Griesa, to
whom this case was then assigned, ordered Gibson to file
an amended complaint within sixty days with more
specific information to show why he is entitled to relief.
On May 23, 1996, the plaintiff filed a slightly more
detailed complaint (the "First Amended Complaint"),
which was accepted by the Court as meeting the
requirements of the May 9, 1996 Order. On March 4,
1997, the defendants filed a motion to dismiss the First
Amended Complaint for failure to state a claim.[FN2] At a
March 7, 1997, pretrial conference held on the record, the

Court allowed the plaintiff to either oppose that motion or
further amend his complaint. On April 7, 1997, the
plaintiff filed a Second Amended Complaint which
contained more detail and which changed the named
defendants to those listed in the caption of this Opinion
and Order. The defendants now move to dismiss the
Second Amended Complaint for failure to state a claim
and the plaintiff moves for the entry of a default judgment
against defendant Robert Ortiz ("Ortiz").[FN3] For the
reasons stated below, the motion to dismiss is granted in
part and denied in part and the motion for entry of a
default judgment is denied.

   FN1. Gibson has since been convicted and
   transferred to the custody of the New York State
   Department of Corrections.

   FN2. The motion to dismiss the First Amended
   Complaint was made on behalf of defendants
   named in that pleading: the New York City
   Department of Correction Otis Bantum
   Correctional Facility, Warden Ortiz, and Deputy
   Warden Edwin Knight.

   FN3. The instant motion was originally made
   solely on behalf of the City of New York. After
   having been served with the Second Amended
   Complaint in July 1997, defendants Clyton
   Eastmond and Edwin Knight joined in the
   motion. On September 23, 1997, the plaintiff
   moved to have a default judgment entered
   against Robert Ortiz, who had also been served
   in July 1997, but who had not filed an answer.
   On October 7, 1997, Assistant Corporation
   Counsel Renee Nebens filed a declaration
   seeking to have Robert Ortiz join in the instant
   motion. For the reasons described elsewhere in
   this Opinion, the October 7 request is granted.

Background

   The Court takes as true the facts as alleged in the
Second Amended Complaint. Beginning on or about
February 10, 1996, Gibson was confined in the Central

Not Reported in F.Supp., 1998 WL 146688 (S.D.N.Y.)

(Cite as: 1998 WL 146688 (S.D.N.Y.))

Punitive Segregation Unit ("CPSU") [FN4] at Rikers Island for a period of ninety days after a disciplinary hearing. [FN5] For the first thirty days of Gibson's CPSU confinement, he was housed at the James A. Thomas Center ("JATC") even though JATC "was ordered closed due to high levels of asbestos, insect infestation and possibly lead paint" and "the general population inmates were moved to other buildings." On March 10, 1996, the CPSU was moved to the Otis Bantum Correctional Center ("OBCC"). While Gibson was housed in OBCC CPSU between March 10 and May 16, 1996, he was denied access to recreation on eight occasions (March 10, 11, and 14, April 3, 13, 20, and 22, and May 4), denied access to the law library on four occasions (March 27, 28, and 29, and April 10), denied access to a religious service on March 15, and required to choose between access to recreation and the law library on April 18 and between access to recreation and the barber shop on April 19. Gibson states that he reported each deprivation to defendants Deputy Warden Edwin Knight ("Knight") and Deputy Warden Clyton Eastmond ("Eastmond"), both of whom failed to intervene or prevent the recurrence of these deprivations. In addition, the plaintiff alleges that Ortiz was aware of the problems because Knight and Eastmond reported to him.

> FN4. The defendants explain that the CPSU is the housing area at Rikers Island where inmates who have been disciplined for rules' infractions are housed.

> FN5. The plaintiff does not say when his confinement in CPSU began or for what offense he was confined. The Court has inferred the date on which Gibson's confinement began from the other events for which the plaintiff provides dates.

**\*2** Gibson also states that the defendants were deliberately indifferent to his condition as an asthmatic. During a slashing incident in the law library, a John Doe Captain and a corrections officer used a chemical agent (mace) in an attempt to subdue another inmate. While Gibson was not involved in the fight, he was present in the law library at the time and the exposure to the chemical agent triggered an asthma attack. Gibson returned to his cell and used his inhaler to stop the attack. Gibson complains that he was not asked by prison officials if he

wanted to see a doctor and was not taken to the prison infirmary.

Finally, Gibson claims that his due process rights were violated during the procedure which had led to his confinement in CPSU. On May 1, 1996, after an Article 78 proceeding, the infraction for which Gibson was confined in CPSU was dismissed due to "a late warden signature." Gibson, however, was not released from CPSU for another fifteen days, that is, until May 16, 1996, his regularly scheduled release date. Gibson daily asked John Doe Area Captains and Knight why he was being held beyond his confinement date. These individuals told Gibson that they had checked and had not received an order for his release.

Standard for Motion to Dismiss

A court may dismiss an action pursuant to Rule 12(b)(6), Fed.R.Civ.P., only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which will entitle him to relief." ' *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (quoting *Conley v. Koenig,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In considering the motion, the court must take "as true the facts alleged in the complaint and draw[] all reasonable inferences in the plaintiff's favor." *Jackson Nat. Life Ins. v. Merrill Lynch & Co.* 32 F.3d 697, 699–700 (2d Cir.1994). The Court can dismiss the claim only if, assuming all facts alleged to be true, plaintiff still fails to plead the basic elements of a cause of action.

When a plaintiff is proceeding *pro se,* the court must liberally construe the complaint. *See, e.g., Boddie v. Schneider,* 105 F.3d 857, 860 (2d Cir.1997). "A complaint should not be dismissed simply because a plaintiff is unlikely to succeed on the merits." *Baker v. Cuomo,* 58 F.3d 814, 818 (2d Cir.1995).

Discussion

The plaintiff's allegations form the basis for claims (1) that the defendants subjected him to conditions of confinement which violated his constitutional rights, (2) that the defendants interfered with his constitutional right for access to the courts, and (3) that the defendants violated his due process rights in connection with the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 146688 (S.D.N.Y.)

(Cite as: 1998 WL 146688 (S.D.N.Y.))

procedures leading to his confinement in CPSU. The Court considers each of these claims in turn.

I. *Conditions of Confinement*

Since the plaintiff was a pretrial detainee at the time of the alleged deprivations, his claims regarding the conditions of his confinement are governed by the Due Process Clause of the Fourteenth Amendment. *See Bryant v. Maffucci,* 923 F.2d 979, 983 (2d Cir.1991) (citing *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)). Under the Due Process Clause, the state may subject a pretrial detainee to restrictions that are inherent to confinement in a detention facility so long as those conditions do not amount to punishment. *See Bell,* 441 U.S. at 536–7. "Not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense ...." *Id.* at 537. The Supreme Court has stated that the issue is whether " 'the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." ' *Block v. Rutherford,* 468 U.S. 576, 584, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984) (quoting *Bell,* 441 U.S. at 538).

**\*3** While the Supreme Court has not provided specific guidance for determining when a pretrial detainee's rights have been violated, it has held that a person's Due Process rights regarding the conditions of confinement under the Fourteenth Amendment are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *City of Revere v. Massachusetts General Hospital,* 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) (citations omitted). *See Bryant,* 923 F.2d at 983; *Hayes v. New York City Dept. of Corrections,* 91 Civ. 4333, 1995 WL 495633 at \*5 (S.D.N.Y. Aug.21, 1995). The Supreme Court has articulated a two part test for determining whether an inmate has suffered an injury of a violation of his Eighth Amendment rights. *See Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). First, there is an objective component which,

> [f]or a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a *substantial risk of serious harm.*

*Id.* (emphasis supplied). Second, there is a subjective component requiring that the prison official have a "sufficiently culpable state of mind," to wit, be deliberately indifferent to the harmful conditions. *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). In *Farmer,* the Court rejected an objective test for a defendant's deliberate indifference, and held instead

> that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official *knows of and disregards an excessive risk to inmate health or safety;* the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer,* 511 U.S. at 837 (emphasis supplied).

1. *Denial of Access to Recreation*

Gibson states that he was denied access to recreation on eight occasions and forced to choose between recreation and the law library or the barber shop on two other occasions. When the dates are compared, it appears that he was deprived on only one occasion of the opportunity for recreation on consecutive days—March 10 and 11.[FN6] While it is well-established that inmates have a right to exercise, *see Williams v. Greifinger,* 97 F.3d 699, 704 (2d Cir.1996), the deprivation of the opportunity to participate in recreation for eight days in a sixty day period, even when coupled with the deprivation of an opportunity to exercise on two consecutive days, is not sufficiently serious to constitute punishment under the Fourteenth Amendment. *See, e.g., Anderson v. Coughlin,* 757 F.2d 35, 36 (2d Cir.1985) (an occasional day without exercise during inclement weather is not cruel and unusual punishment); *Davidson v. Coughlin,* 968 F.Supp. 121, 129 (S.D.N.Y.1997) (collecting cases under Eighth Amendment).

> FN6. Gibson does not specify which option he chose when he was forced to choose between recreation and the law library or the barber shop. If he chose to forgo recreation on both of these occasions, it is possible that there were also three consecutive days when he did not have recreation—April 18, 19 and 20. This three day

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 146688 (S.D.N.Y.)

(Cite as: 1998 WL 146688 (S.D.N.Y.))

deprivation, however, would have been partially the result of a choice made by the plaintiff rather than solely the result of the defendants' actions.

### 2. *Denial of Religious Service*

Gibson alleges that he was denied access to a religious service on one occasion. This single deprivation is insufficient to state a deprivation that amounts to punishment. *See, e.g., Giglieri v. New York City Dep't of Corrections,* 95 Civ. 6853, 1997 WL 419250 at *3 (S.D.N.Y. July 25, 1997) (duration is one factor to consider in determining whether a deprivation or condition violates a pretrial detainee's Fourteenth Amendment rights). *But see Cruz v. Jackson,* 94 Civ. 2400, 1997 WL 45348 at *7 (S.D.N.Y. Feb.5, 1997) (denial of access to religious services for fifteen day period sufficient to state a claim).

### 3. *Medical Claim*

**\*4** Gibson further claims that he was denied adequate medical care when a corrections officer used mace to subdue another inmate while Gibson was in the vicinity. Specifically, Gibson complains that no officer asked him if he wanted to go to the infirmary after Gibson suffered an asthma attack. Gibson's allegations fail to meet either component of the test for a violation of his constitutional rights. While asthma may in some circumstances constitute a serious condition, Gibson promptly controlled his asthma attack with his inhaler and does not state that he suffered any further harm. Moreover, since the asthma was promptly controlled, corrections officers were not deliberately indifferent to his medical needs by failing to ask him if he wanted to go to the infirmary.

### 4. *Conditions at JATC*

Gibson alleges that during the thirty days he was confined at JATC before the CPSU was transferred to OBCC he was exposed to asbestos, insect infestation and perhaps lead paint. Further, he alleges that the CPSU remained at JATC for thirty days after a court order had closed the facility and after general population inmates had been transferred to different facilities. Gibson's allegations are sufficient to state a claim. First, Gibson's allegations regarding the conditions at JATC, coupled with the duration of his confinement there and the alleged

existence of a court order closing the facility, are sufficient to describe a substantial risk of serious harm. Second, liberally construing the complaint, Gibson implies that the defendants were deliberately indifferent to that substantial risk because it took thirty days for the defendants to move the CPSU after a court order had closed JATC and after the general population inmates had been transferred.

### II. *Denial of Access to the Law Library*

The plaintiff alleges that on four occasions he was denied access to the law library and on another occasion he was forced to choose between the law library and recreation.[FN7] The Court understands the plaintiff to be complaining of interference with his constitutionally protected right of access to the courts. In order to state a claim for denial of access to the courts, "a plaintiff must demonstrate that a defendant caused 'actual injury,' i.e. took or was responsible for actions that 'hindered [a plaintiff's] efforts to pursue a legal claim." ' *Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997) (quoting *Lewis v. Casey,* 518 U.S. 343, ——, 116 S.Ct. 2174, 2179, 2180, 135 L.Ed.2d 606 (1996)). The actual injury requirement derives from the doctrine of standing. *Id.* Here, Gibson has not alleged that he was hindered in his efforts to pursue a legal claim. Given that the plaintiff has amended his complaint twice—once after the defendants' first motion to dismiss specifically raised this issue—and that the denial of access occurred at most five times in a sixty day period, the Court finds that granting the plaintiff further leave to amend regarding this allegation would be futile.

> FN7. The plaintiff does not state which option he chose on this occasion.

### III. *Due Process Violation*

**\*5** Gibson claims that his due process rights were violated in two ways. First, there were procedural irregularities in the process by which he was first confined in the CPSU.[FN8] Second, he was held in the CPSU for fifteen days after his disciplinary sentence had been vacated in an Article 78 proceeding. The Second Circuit has stated that

> FN8. Gibson identifies the procedural irregularity as a "late warden signature," but indicates that he requires discovery to determine

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 146688 (S.D.N.Y.)

(Cite as: 1998 WL 146688 (S.D.N.Y.))

the exact irregularity which caused the disciplinary decision to be revoked through the Article 78 proceeding.

[d]etermining whether an inmate has received due process involves "a two-pronged inquiry: (1) whether the plaintiff had a protected liberty interest in not being confined ... and, if so, (2) whether the deprivation of that liberty interest occurred without due process of law."

_Sealey v. Giltner,_ 116 F.3d 47, 51 (2d Cir.1997) (quoting _Bedoya v. Coughlin,_ 91 F.3d 349, 351–52 (2d Cir.1996) (ellipses in original)). To show a protected liberty interest arising from state law, an inmate must show that the restraint imposes an "atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." _Sandin v. Conner,_ 515 U.S. 472, 482, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). The relevant factors which a court must consider to determine if a hardship is "atypical and significant" include:

(1) the effect of disciplinary action on the length of prison confinement; (2) the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions; and (3) the duration of the disciplinary segregation imposed compared to discretionary confinement.

_Wright v. Coughlin,_ 132 F.3d 133, 136 (2d Cir.1998). _See also Sealey,_ 116 F.3d at 52; _Brooks v. Di Fasi,_ 112 F.3d 46, 49 (2d Cir.1997); _Miller v. Selsky,_ 111 F.3d 7, 9 (2d Cir.1997).

The Court will address the third factor—the duration of Gibson's confinement—first. The defendants, citing _Young v. Hoffman,_ 970 F.2d 1154, 1156 (2d Cir.1992), argue that Gibson's first due process claim fails since his state challenge cured any procedural defect. Thus, they argue, Gibson was improperly confined for at most fifteen days. The Second Circuit has held, however, that

[t]he rule is that once prison officials deprive an inmate of his constitutional procedural rights at a disciplinary hearing and the prisoner commences to serve a punitive sentence imposed at the conclusion of the hearing, the

prison officials responsible for the due process deprivation must respond in damages, absent the successful interposition of a qualified immunity defense.

_Walker v. Bates,_ 23 F.3d 652, 658–59 (2d Cir.1994).[FN9] Thus, the Court properly considers the full ninety days in determining whether Gibson was deprived of a liberty interest.

> FN9. While the Second Circuit has not discussed the issue resolved in _Walker_ since the Supreme Court's decision in _Sandin,_ the Circuit has been faced with fact patterns which indicate that it adheres to the analysis in _Walker. See, e.g., Wright,_ 132 F.3d at 135 (plaintiff's 288 day sentence overturned by Article 78 proceeding and then followed by Section 1983 action for damages); _Brooks,_ 112 F.3d at 48 (plaintiff's 180 day sentence overturned by Article 78 proceeding and then followed by Section 1983 action).

While ninety days may not always be a significant deprivation, the Court is unable to determine based on the record now presented whether the duration of Gibson's disciplinary segregation—for either the full ninety day or the shorter fifteen day period—is similar to discretionary confinement of pretrial detainees. Similarly, the Court has no basis to make a determination of whether the conditions of disciplinary confinement differ from routine prison conditions—the second factor for consideration. At present, the record is clear as to only one factor, that is, the first factor. Gibson has not claimed that his confinement in CPSU in any way altered the term of his prison confinement.

**\*6** Assuming that Gibson's confinement in the CPSU implicated a protected liberty interest, he has stated a claim for a violation of his due process rights on only one of his two theories. As articulated in _Wolff v. McDonnell,_ 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Due Process Clause requires that prisoners be provided with written notice at least 24 hours prior to the hearing of the alleged violation of the disciplinary rules, a written statement indicating what evidence the fact-finder at the hearing relied upon and the reason for the disciplinary

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 146688 (S.D.N.Y.)

(Cite as: 1998 WL 146688 (S.D.N.Y.))

action taken, and, if institutional safety requires the omission of certain evidence, a statement indicating the fact of such omission. *Id.* at 564–65. Gibson has not alleged that he was deprived of any of the procedures required under *Wolff* at the proceeding for which he was initially confined in the CPSU. Moreover, if the defendants had failed to follow any of these procedures, Gibson would not be aware of the deficiency and would not require discovery to state a claim. Thus, Gibson has failed to state a claim on his first theory. As to Gibson's second theory—that he was confined to the CPSU for fifteen days after the Article 78 proceeding vacated his disciplinary sentence—further factual development of the factors described above is required to determine whether fifteen days of disciplinary confinement for a pretrial detainee imposes an "atypical and significant hardship."

### IV. *Motion for a Default Judgment*

Default judgments are governed by Rule 55, Fed.R.Civ.P. Rule 55(a) provides for entry of a default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend as provided by these rules." Rule 55(a), Fed.R.Civ.P. A court "[f]or good cause shown may set aside an entry of default." Rule 55(c), Fed.R.Civ.P. Although Rule 55(c) applies on its face to setting aside defaults already entered, the same analysis should be employed in evaluating opposition to entry of a default. *See Commercial Bank of Kuwait v. Rafidain Bank,* 15 F.3d 238, 243 (2d Cir.1994). The Second Circuit has stated that

> [g]ood cause depends upon such factors as the willfulness of the default, the prejudice the adversary would incur were the default set aside [or should the Court decline to enter it], and the merits of the defense proffered.

*In re Chalasani,* 92 F.3d 1300, 1307 (2d Cir.1996). In addition, the Court must keep in mind the "oft-stated preference for resolving disputes on the merits." *Enron Oil Corp. v. Diakuhara,* 10 F.3d 90, 95 (2d Cir.1993).

Here, Gibson asks the Court to enter a default judgment against Ortiz. Gibson has not shown that the default by Ortiz was willful. Ortiz joined the other defendants in moving to dismiss the *First* Amended

Complaint. Only after the plaintiff filed and served a Second Amended Complaint did Ortiz neglect initially to join the motion to dismiss the Second Amended Complaint. Additionally, Gibson has not shown that he would suffer any prejudice from the Court declining to enter the default judgment against Ortiz. Finally, Ortiz may be able to interpose a successful defense; Gibson has not alleged that Ortiz was personally involved in the claims that survive the motion to dismiss. *See Sealey,* 116 F.3d at 51.[FN10]

> FN10. While the defendants included in their motion to dismiss the First Amended Complaint an argument based on the plaintiff's failure to allege personal involvement, they have not included such an argument in the instant motion.

### Conclusion

**\*7** The defendants' motion to dismiss is granted on all claims, except the plaintiff's claims that he was subjected to unconstitutional conditions of confinement while housed in the JATC CPSU for thirty days and that he was held in the CPSU for fifteen days after his disciplinary sentence had been vacated in an Article 78 proceeding. The plaintiff's motion for the entry of a default judgment against defendant Ortiz is denied.

SO ORDERED:

S.D.N.Y.,1998.

Gibson v. City of New York
Not Reported in F.Supp., 1998 WL 146688 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1993 WL 88144 (S.D.N.Y.)

(Cite as: 1993 WL 88144 (S.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jerry YOUNG, a/k/a Ramadan, Plaintiff,
v.
Charles SCULLY, Thomas A. Coughlin, C. Artuz,
Donald Selsky, Defendants.
Jerry Young a/k/a Ramadan, Plaintiff,
v.
Thomas A. COUGHLIN, III, Bobby Joe Laboy,
Battista, Defendants.
Jerry YOUNG, a/k/a Ramadan, Plaintiff,
v.
C. ARTUZ, Donald Selsky, R. Sanford, Jochnewicz,
Sgt. Defendants.
Jerry YOUNG, a/k/a Ramadan, Plaintiff,
v.
Thomas A. COUGHLIN, III, Commissioner of Dept of
Correctional Services, J. Soto, B. Laboy, A. Kimelman,
Battista, Defendants.
Nos. 91 Civ. 4332(JSM), 91 Civ. 4801(JSM), 91 Civ.
6768(JSM), and 91 Civ. 6769(JSM)

March 22, 1993.
MEMORANDUM OPINION AND ORDER

MARTIN, District Judge:

**\*1** In these consolidated actions, Plaintiff Jerry Young ("Young"), a state prisoner, is suing several correction officials for damages under 42 U.S.C. § 1983 for alleged due process violations in (i) the conduct of his disciplinary hearings at Green Haven Correctional facility; and (ii) his confinement in a plexiglass cell and the issuance of a deprivation order. The Plaintiff further alleges that the denial of privileges during his confinement violated both his first and eighth amendment rights. The parties now cross move for summary judgment.

FACTUAL BACKGROUND

Plaintiff first challenges the constitutionality of six disciplinary hearings, claiming that he was denied his constitutional right to call witnesses of his choosing.

During these hearings, Young requested one or more of the following as witnesses: Commissioner Coughlin, Department of Correctional Facilities ("DOCS") Special Housing Director Selsky, DOCS Inspector General Brian Malone, Green Haven Superintendent Scully, First Deputy Superintendent Artuz, Deputy Superintendent for Security Demski, United States District Judge Kram, Inmate Aramas, and Inmate Codrington. Plaintiff also alleges that he was denied his right to effective employee assistance.

Plaintiff next contends that his denial of privileges from January 6, 1991 through January 10, 1991 and his confinement in a plexiglass cell from January 10, 1991 through January 14, 1991 and again from February 22, 1991 to March 2, 1991 were without notice of charges or hearing, and thus violated his due process rights.

Lastly, Plaintiff challenges his denial of privileges during confinement on the ground that the deprivation amounted to cruel and inhuman punishment in violation of his eighth amendment rights. He also asserts that certain deprivations violated his first amendment rights.

DISCUSSION

1. The Conduct of the Disciplinary Hearings

The Supreme Court has recognized an inmate's right to call witnesses at prison disciplinary hearings. Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963 (1974). However, this right is "necessarily circumscribed by the penological need to provide swift discipline in individual cases." Ponte v. Real, 471 U.S. 491, 495, 105 S.Ct. 2192, 2195 (1985). Specifically, the right to call witnesses is subject to the "mutual accommodation between institutional needs and objectives and the provisions of the Constitution." Baxter v. Palmigiano, 425 U.S. 308, 321, 96 S.Ct. 1551, 1559 (1976). The Supreme Court has held that a hearing officer may refuse to call a witness (i) if granting the request would be "unduly hazardous to institutional safety or correctional goals"; (ii) if necessary "to keep the hearing within reasonable limits"; or (iii) for reasons of "irrelevance" or "lack of necessity." Wolff, 418 U.S. at 566, 94 S.Ct. at 2980; see also Ponte, 471 U.S. at 496–977, 105 S.Ct. at 2195–96.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 88144 (S.D.N.Y.)

(Cite as: 1993 WL 88144 (S.D.N.Y.))

In the case at hand, the hearing officer denied Plaintiff's request to call the following witnesses: DOCS Commissioner Coughlin, Special Housing Director Selsky, Inspector General Brian Malone, Green Haven Superintendent for Security Demskie, and U.S. District Judge Kram. None of these requested witnesses had any personal knowledge of the incidents that gave rise to the disciplinary charges. As such, the hearing officer's refusal to call these witnesses on the ground of relevance did not violate Plaintiff's qualified right to call witnesses since, consistent with due process, the hearing officer could refuse to call the witnesses for that very reason.[FN1]

**\*2** The hearing officer was also correct in refusing to require the testimony of two inmate witnesses, Aramas and Codrington. One hearing concerned an altercation which occurred in the showers of the cell block. The hearing officer refused to call Aramas and Codrington on the ground that their testimony would be irrelevant. The hearing officer found that at the time of the incident the two inmates "were locked in their cell, they were not in the shower with Young, did not see what happened, and could not hear what was ordered by staff." Mindful of the Supreme Court's admonition in *Wolff* that "[w]e should not be too ready to exercise oversight and put aside the judgment of prison administrators," *Wolff,* 418 U.S. at 566, 94 S.Ct. at 2979, we refuse to disturb the hearing officer's finding.

Plaintiff Young further asserts that his due process rights were violated in that he was not allowed to call inmate Codrington in connection with two other hearings. Young misapprehends the facts. Contrary to Young's assertion, Codrington was not prohibited from testifying. Rather, the record indicates that Codrington of his own volition refused to testify. As there is no right to compel an inmate to testify, *see, e.g., Smith v. Coughlin,* No. 89–0321, slip op. (N.D.N.Y. April 8, 1992), Young's claim based on inmate Codrington's refusal to testify must fail.[FN2]

Lastly, while an inmate is entitled to effective employee assistance, *Eng v. Coughlin,* 858 F.2d 889, 897–98 (2d Cir.1988), such assistance is qualified. Here, Young contends that Defendant Jochnewicz, Young's employee assistant in one hearing, is liable for failing to interview various prison officials and inmate Codrington. However, as mentioned earlier, these officials had no personal knowledge of the incident. Interviewing these Defendants would have been fruitless and as such was not required. As for Codrington, Young once again misapprehends the facts. Codrington, the only one of the four Defendants with knowledge relevant to Young's hearing, was in fact interviewed. As such, Young received effective employee assistance.

### 2. The Plexiglass Confinement and Deprivation Order

Plaintiff alleges that he was confined to a plexiglass cell and deprived of certain privileges without notice or hearing in violation of his due process rights. In evaluating his claim, we must first determine whether a protected liberty interest was infringed and, if so, whether the procedures employed by the state afforded the Plaintiff adequate due process.

State regulations create a constitutionally protected liberty interest when they establish substantive limitations on official discretion and contain "explicitly mandatory language, i.e., specific directives to the decision maker that if the regulations' substantive predicates are not present, a particular outcome must follow." *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 462–64, 109 S.Ct. 1904, 1910 (1989); *see also Hewitt v. Helms,* 459 U.S. 460, 471–72, 103 S.Ct. 864 (1983); *Olim v. Wakinekona,* 461 U.S. 238, 249 (1983); *Russell v. Coughlin,* 910 F.2d 75, 77 (2d Cir.1990).

**\*3** Turning to Young's claim that he was confined to a plexiglass cell without due process, we note that regulation 7 N.Y.C.C.R. § 305.6, while containing substantive predicates to guide official decision making concerning the use of plexiglass shields, "stop short of requiring that a particular result is to be reached," *Thompson,* 490 U.S. at 462, 109 S.Ct. at 1910. Specifically, § 305.6(b) provides that "[c]ell shields *may* be applied for good cause including, but *not limited to,* the reasons listed below." 7 N.Y.C.C.R. § 305.6(b) (emphasis added). The words "may" and "not limited to" make it clear that the official's decision is discretionary and is not limited to enumerated substantive predicates. The failure of the regulation to provide mandatory language or criteria defeats Young's claim that the regulation creates a liberty

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 88144 (S.D.N.Y.)

(Cite as: 1993 WL 88144 (S.D.N.Y.))

interest.

By contrast, the language in Regulation 7 N.Y.C.C.R. § 305.2(a), by requiring specific substantive predicates for issuance of deprivation orders, creates a liberty interest which may not be deprived without due process.[FN3] Section 305.2(a) provides that "[a]n order depriving an inmate of a specific item, privilege or service may be issued when it is determined that a threat to the safety or security of staff, inmates, or state property exists." 7 N.Y.C.C.R. § 305.2(a). As such, the issuance of deprivation orders is limited to situations in which a threat is present. In so limiting the issuance of deprivation orders, New York State has created a liberty interest and must accordingly provide procedural safeguards. However, an inmate is not necessarily entitled to a full panoply of procedural safeguards. The process required is determined by balancing the private interest affected against the interests and concerns of the government. Here, in an administrative confinement, the balancing test tips in favor of the government's compelling interest in maintaining prison safety, and "an informal, nonadversary review" is sufficient to satisfy the due process requirement. *Hewitt,* 459 U.S. at 476, 103 S.Ct. at 873; *Patterson v. Coughlin,* 761 F.2d 886, 980–81 (2d Cir.1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879 (1986). Accordingly, due process is satisfied if the inmate is provided with "notice of the charge against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." *Hewitt,* 459 U.S. at 476, 103 S.Ct. at 873; *see also Gittens v. Lefevre,* 891 F.2d 38, 40 (2d Cir.1989).

Here, the record is unclear as to whether Young received sufficient due process. The record indicates that Young did pose a threat to safety, that the deprivation order was reviewed and approved by a second correction official before being issued, and that the deprivation order was reviewed daily to determine if it was necessary to be continued. However, the record is silent as to whether Young was given an opportunity to voice his objections " 'at a meaningful time and in a meaningful manner.' " *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 902 (1976) (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191 (1965)); *Giglio v. Dunn,* 732

F.2d 1133, 1135 (2d Cir.), *cert. denied,* 469 U.S. 932, 105 S.Ct. 328 (1984).

**\*4** While a more complete record would be helpful, we need not pass on this issue today. This is because we conclude that summary judgment should be awarded to the Defendants on the ground that the officials are shielded under the doctrine of qualified immunity. Specifically, state officials are shielded "from personal liability for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or insofar as it was objectively reasonable for them to believe that their acts did not violate those rights." *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991), *cert. denied,* 112 S.Ct. 3032 (1992) (citations omitted); *see also Robison v. Via,* 821 F.2d 913, 920–21 (2d Cir.1987); *Krause v. Bennett,* 887 F.2d 362, 368 (2d Cir.1989). An official will enjoy immunity when his actions were objectively reasonable when assessed in the light of the legal rules that were clearly established at the time the action was taken. *Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 3038 (1987); *Harlow v. Fitzgerald,* 457 U.S. 800, 819, 102 S.Ct. 2727, 2739 (1982).

Here, the regulation at issue, while containing mandatory language, also contained permissive language, and as such ambiguity existed. Nor could it be said that case law on the subject was sufficiently clear to preclude immunity. We are aware of no decisions issued prior to the incidents in this case recognizing a liberty interest in remaining free from the restraints imposed through deprivation orders. Indeed, such deprivations had been found not violative of due process in at least two state court decisions. *See Bogle v. Coughlin,* 569 N.Y.S.2d 831 (3d Dep't 1991); *Malik v. Coughlin,* 550 N.Y.S.2d 219 (3d Dep't 1990). Because we find that case law is not clearly established in this area, it cannot be said that the actions taken by the Defendants were unreasonable and contrary to clearly established law. Accordingly, the Defendants are entitled to good faith immunity as a matter of law.

### 3. The Denial of Cell Privileges and Property

In Plaintiff's brief in support of his cross-motion for summary judgment, he asserts that his confinement and the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 88144 (S.D.N.Y.)

(Cite as: 1993 WL 88144 (S.D.N.Y.))

accompanying deprivations amounted to cruel and unusual punishment. Specifically, Plaintiff alleges that he was denied exercise, shower and hot water, cell cleaning equipment, wardrobe and hygiene articles, and religious and legal books "without penological justification."

It is well settled that the eighth amendment, which applies to states through the due process clause of the fourteenth amendment, *Robinson v. California,* 370 U.S. 660, 666, 82 S.Ct. 1417, 1420 (1962), prohibits "cruel and unusual" punishment suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285 (1976).

However, to establish an eighth amendment claim based on a post-sentencing deprivation, a plaintiff must go beyond showing that the deprivation constitutes an "unnecessary and wanton infliction of pain." *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2400 (1981). The plaintiff must also establish that the defendants acted with the requisite intent. *Wilson v. Seiter,* 111 S.Ct. 2321, 2324 (1991). Stated differently,

**\*5** After incarceration, only the unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment. To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interests or safety.... It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock.

*Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084 (1986) (citations omitted; internal quotations omitted).

Turning to the facts at hand, we must conclude that the Plaintiff's allegations, except for one, fail to satisfy the objective requirement of serious deprivation articulated in *Rhodes*. *Rhodes* holds that the objective element is satisfied where punishment results "in unquestioned and serious deprivations of basic human needs" or "deprive[s] inmates of the minimal civilized measure of life's

necessities." *Rhodes,* 452 U.S. at 347, 101 S.Ct. at 2399 (1981). Here, no such egregious deprivation occurred.

The record shows, and Plaintiff does not dispute, that for the most part the deprivations complained of were imposed to safeguard institutional security and specifically the safety of other correctional staff. The record also shows that the deprivations complained of were *de minimis* in nature and lasted only for a period of several days. None of the deprivations, the curtailing of exercise and shower privileges, or the surrender of toiletries and books, rose to the level of extreme deprivation. Furthermore, as we "do not sit to supervise state prisons," *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532 (1976), we defer to the experience of the Defendants in concluding that these deprivations were both necessary and justified. Because Young has failed to establish the elements of an eighth amendment claim, these claims fail as a matter of law and summary judgment is properly awarded to the Defendants.

Our decision today is not without support. Courts have routinely held that claims such as Young's fail to amount to cruel and unusual punishment. *See, e.g., Green v. Ferrell,* 801 F.2d 765, 771–72 (5th Cir.1986) (denial of exercise for limited duration); *Leonard v. Norris,* 797 F.2d 683, 685 (8th Cir.1986) (denial of exercise privileges for fifteen days); *Johnson v. Williams,* 768 F.Supp. 1161, 1167 (E.D.Va.1991) (limitations on exercise upheld); *Scher v. Purkett,* 758 F.Supp. 1316 (E.D.Mo.1991) (denial of shampoo and deodorant); *Jackson v. Ward,* 458 F.Supp. 546 (W.D.N.Y.1978) (upholding limitations on access to written materials); *Jordan v. Arnold,* 408 F.Supp. 869 (M.D.Pa.1976) (two showers and two hours of exercise per week sufficient); *Spain v. Procunier,* 408 F.Supp. 534 (N.D.Cal.1976) (short term denial of shower privileges), *aff'd in part on other grounds, rev'd in part on other grounds,* 600 F.2d 189 (9th Cir.1979).

**\*6** Young also asserts that, as part of the deprivation order, he was essentially "stripped"; i.e., deprived of "soap, toothpaste, toothbrush, showers, mattress, blanket, sheets, pillow, pillowcase, toilet paper, pants, shirt, undershirt, socks, shoes, slippers." However, evidence submitted by the government has shown that, contrary to Plaintiff's allegations that he was confined naked in a bare

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 88144 (S.D.N.Y.)

(Cite as: 1993 WL 88144 (S.D.N.Y.))

cell, *see* *Wright v. McMann,* 460 F.2d 126, 129 (2d Cir.) (strip cell confinement cruel and unusual), *cert. denied,* 409 U.S. 885, 93 S.Ct. 115 (1972); *LaReau v. MacDougall,* 473 F.2d 974, 978 (2d Cir.1972) (same), *cert. denied,* 414 U.S. 878, 94 S.Ct. 49 (1973), Plaintiff was at all times provided with at least a "tee shirt, undershorts, paper slippers or socks, a mattress, and a blanket at nighttime." Affidavit of Bobbie Jo LaBoy ("LaBoy Aff."). Such treatment does not rise to the level of extreme deprivation required of an eight amendment violation, for the reasons stated above.

*4. Access to Religious and Legal Materials*

The Second Circuit has stated:
In the close and restrictive atmosphere of a prison, first amendment guarantees taken for granted in society at large assume far greater significance. The simple opportunity to read a book or write a letter, whether it expresses political views or absent affections supplies a vital link between the inmate and the outside world, and nourishes the prisoner's mind despite the blankness and bleakness of his environment. Accordingly, courts have jealously protected the inmate in his exercise of first amendment prerogatives.

*Wolfish v. Levi,* 573 F.2d 118, 129 (2d Cir.1978), *rev'd,* 441 U.S. 520, 99 S.Ct. 1861 (1979).

A prisoner's first amendment rights, however, are not unlimited: "Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049 (1948). Thus a prisoner's first amendment rights must yield when "inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system," *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 2804 (1974), although these restrictions must be "reasonably adapted to achieving a penological objective," *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 2404 (1987); *see also* *Young v. Coughlin,* 866 F.2d 567 (2d Cir.), *cert. denied,* 492 U.S. 909, 109 S.Ct. 3224 (1989).

Here, Young alleges that he was denied access to religious books for a period of several days, thus depriving him of his first amendment right to freedom of religion. Defendants have not denied this allegation. Evidence presented by the government shows that the removal of Plaintiff's religious books was the result of an incident in which Plaintiff threw coffee at a prison employee. LaBoy Aff. p. 3 & Exhibit B. Plaintiff was deprived of all items, except those listed above, "to protect the safety of Green Haven corrections staff from assault by plaintiff, particularly with any objects in plaintiff's possession." *Id.* If these were the only facts relevant to Plaintiff's claim, the Court would have little trouble determining that such actions were reasonably adopted to penological objectives.

**\*7** But the ostensible safety objective cited by the Government, that of "maintaining the security of the facility and specifically the safety of correction staff from being assaulted with any objects in plaintiff's possession," Government's Sur–Reply Memorandum at 6, is called into question by evidence that Plaintiff would have been allowed *other* books even during this period of deprivation: "The inmate, however, continues to have access to the law library; he must fill out a request form, and the requested books or other materials are delivered to his cell, usually within 24 hours." LaBoy Aff. at 4. While this Court has no desire to condemn a prison administration's admirable attempts to allow inmates access to legal materials, it is difficult to see how religious books can be a threat to the safety of the officers of a facility while legal books are not. However, there is no need to rule on this issue, because it is plain that Plaintiff has not demonstrated culpability.

There is no evidence in the record that the alleged deprivation of Plaintiff's first amendment rights involved any degree of fault by defendants. Nothing indicates that the books were removed with awareness that any of them were integral to Plaintiff's practice of his religion, or that the authorities later received notice of this fact. In short, there is no evidence that the defendants knew or should have known that they were depriving Plaintiff of his first amendment rights, if in fact they were. "Negligence alone will not carry a § 1983 action," *Paulsen v. Gotbaum,* 1992 WL 8361, \*8 (S.D.N.Y.), *aff'd,* 982 F.2d 825 (2d Cir.1992); here there was not even proof of negligence. Furthermore, even if a *prima facie* case under § 1983 were

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1993 WL 88144 (S.D.N.Y.)

(Cite as: 1993 WL 88144 (S.D.N.Y.))

made out, defendants would still be entitled to qualified immunity for their actions taken in good faith; once this defense is raised, it is Plaintiff's burden to defeat it. *Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986). Thus, because there is no genuine issue of material fact as to whether defendants acted culpably or are entitled to good faith immunity, summary judgment for defendants is appropriate.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED; all claims are DISMISSED in their entirety. Plaintiff's motion for summary judgment is DISMISSED as moot.

SO ORDERED.

FN1. Plaintiff counters that "he wrote several complaints to [these officials] about [other] officials harassing him into violating prison rules and since mitigating [sic] is a factor which the hearing officer must consider in determining his sentences their testimony was relevant at least to the issue of punishment." This argument is tenuous at best. Accordingly, we decline to disturb the hearing officer's determination.

FN2. Citing *Silva v. Scully,* 526 N.Y.S.2d 532 (2d Dep't 1988), Young notes that before a hearing officer may refuse to call a witness, the hearing officer must "explore their reasons for not testifying" and communicate these reasons to the inmate. *Silva,* 526 N.Y.S.2d at 534. *See also Barnes v. LeFevre,* 511 N.Y.S.2d 591 (1986); *Briggs v. Lord,* 524 N.Y.S.2d 335 (Sup.Ct.1988). No such explanation is required under federal law. *Ponte v. Real,* 471 U.S. 491, 497, 105 S.Ct. 2192, 2196 (1985). It is well settled that violations of state procedural rules do not of their own accord implicate federal law. *Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.), *cert. denied,* 484 U.S. 896, 108 S.Ct. 229 (1987); *Pollnow v. Glennon,* 757 F.2d 496, 501 (2d Cir.1985); *Smallwood–El v. Coughlin,* 589 F.Supp. 692, 699 (S.D.N.Y.1984). As such, we decline to hold today that the officer's failure to demand an explanation amounts to a constitutional violation redressable under § 1983.

FN3. Young contends that separate liberty interests were created in the right to shower, exercise, and maintain personal property. We need not address this contention, however, since privileges cited by Young may be denied upon issuance of a deprivation order. As such, we confine our discussion to whether a liberty interest has been created in remaining free from the restraints imposed by a deprivation order.

S.D.N.Y.,1993.

Young v. Scully
Not Reported in F.Supp., 1993 WL 88144 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.